# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

   Plaintiff,

vs.             No. CIV 11-0416 JB/WPL

MARK HOPKINS; SHARON HOPKINS;
HOUSE OF ROYALE, INC.; SHALOM
ENTERPRISES, INC.; VICKI L. ASHCRAFT and
SUSAN G. SHADIX as trustees for GRACE
TRUST; ADVANCED ELECTRONICS; STATE
OF NEW MEXICO REVENUE DEPARTMENT;
and BAYVIEW LOAN SERVICING, LLC.

   Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) the United States' Motion for Summary

Judgment, filed July 16, 2012 (Doc. 66); (ii) the Defendants' Motion for Leave of Court to Reply

to Plaintiffs' Reply to Hopkins' Response to Motion for Summary Judgment, filed September 4,

2012 (Doc. 106)("Motion for Surreply"); and (iii) the Defendants' Motion for Telephonic

Appearance Re: Motion Hearing on January 3, 2013, filed December 21, 2012 (Doc.141).   The

Court held a hearing on January 3, 2013.   The primary issues are: (i) whether Plaintiff United

States of America may reduce to judgment the outstanding tax assessments for tax years 1996,

1997, 1999, 2000, and 2001 against Defendants Mark Hopkins and Sharon Hopkins, who were

convicted of tax evasion for these same years in the United States' case against them, <u>United States</u>

<u>v. Mark E. Hopkins and Sharon J. Hopkins</u>, No. CR 09-0863 MCA (D.N.M.); and (ii) whether the

United States is entitled to foreclosure on its federal tax liens encumbering the Hopkins' interest in

certain real properties located in Eddy County, New Mexico, in partial satisfaction of their tax

liabilities owed to the Internal Revenue Service ("IRS").   For the reasons stated on the record at the hearing, the Court grants the Hopkins' Motion for Surreply and their Defendants' Motion for Telephonic Appearance Re: Motion Hearing on January 3, 2013.   Because there are no genuine issues of material fact, and because the United States is entitled to judgment as a matter of law, the Court will grant in part and deny in part the United States' Motion for Summary Judgment. Although the Hopkins have a liberty interest in their right to engage in the common occupation of their choosing, pursuant to Article I, section 8 and the Sixteenth Amendment of the United States Constitution, Congress constitutionally can tax the Hopkins' income from the exercise of that right.   Because Congress can constitutionally tax the Hopkins' income and has not specifically exempted, excepted, or excluded the Hopkins' income from taxation under the Internal Revenue Code ("IRC"), the Hopkins' income from their labor is not exempt from taxation.   The United States was the plaintiff in the criminal case against the Hopkins, and necessary to the jury's verdict that the Hopkins were guilty of Criminal Tax Evasion for tax years 1996-1997, and 1999-2001, was establishing that the Hopkins owed the United States a substantial amount of tax, and that the Hopkins used nominees and/or alter-egos to shelter their income from the United States to evade taxes.   The doctrine of res judicata thus prevents the Hopkins from relitigating those issues in this civil case against them.   Because the record establishes that there is no genuine dispute whether the IRS assessments underlying the IRS' federal tax liens on which they seek to foreclose are valid and accurate, and there is no material dispute whether the Hopkins used the Defendants Grace Trust, Shalom Enterprises, Inc., and House of Royale, Inc. as their nominees or alter-egos to shield their assets from the IRS, there is no genuine dispute that the United States is entitled to foreclose on its liens against the subject property and is entitled to summary judgment as a matter of law. Because the United States has agreed with Defendant Bayview Loan Servicing, LLC, that they

-2-

will equitably divide profits from the sale of Tract #1, the Court denies the United States'
Summary Judgment to the extent it seeks the Court to declare that its interest in Tract #1 is prior
and superior to any other interest in the property.

## FACTUAL BACKGROUND

In support of its motion, the United States relies on specific pleadings, admitted United
States exhibits, and trial transcripts from the Hopkins' criminal case, United States v. Hopkins.[1]
Additionally, the United States relies upon a declaration and its IRS exhibits.   Finally, the United
States relies upon the following undisputed facts:[2]

---

[1] The United States filed concurrently with its Motion for Summary Judgment a Brief in
Support of the motion, exhibits, and an Appendix, and incorporates all of these documents by
reference into its SJ Motion.   See United States' Brief Supporting its Motion for Summary
Judgment at 1, filed July 16, 2012 (Doc. 66-1)("MSJ Brief").   In the Appendix are specific
pleadings, admitted United States exhibits, and trial transcripts in the Hopkins' criminal case.   A
declaration and the United States' IRS exhibits are also in the Appendix.   Specifically, the United
States included copies of specific pleadings and exhibits in the Hopkins' criminal case.   The
United States incorporates the allegedly undisputed facts and documents in the Appendix into its
Brief.   The Court will term those pleadings as "Hopkins Crim. Doc."; exhibits admitted into
evidence at the Hopkins' criminal case are termed "Hopkins Crim. Gov. Ex."

[2] Although the Hopkins disagree with the United States almost entirely in their opposition
to the United States' Motion for Summary Judgment, at the hearing on the Motion for Summary
Judgment, the Hopkins clarified that their disagreement is a legal disagreement rather than a
factual one.   The Hopkins stated that their disagreement with the United States' facts that the
United States sets forth as undisputed is "that [the United States] ha[s] limitations and [] can tax
[only] what [it] ha[s] authority over" and that the United States does not have the authority to tax
the "fundamental right to work."   Transcript of Trial at 39:13-24 (taken January 3, 2012)(M.
Hopkins)("Tr.")(the Court's citations to the transcript of the hearing refer to the court reporter's
original, unedited version; any final transcript may contain slightly different page and/or line
numbers.).   The Hopkins conceded that "if we are not exempt everything Mr. Lena [counsel for
the United States] has said is correct."   Tr. at 39:4-6 (M. Hopkins).   The Court responded:

> What I'm hearing is that we really don't need a trial on any issue, there's no
> genuine issue of material fact, but there's a legal issue that you're raising that you
> want the court to determine.   Am I understanding your position correctly . . . .
> I'm not hearing there's really a dispute about the facts.   What there's a dispute
> about is the validity of the assessment from a legal standpoint. Am I -- Is that a

1.      <u>**Federal Income Tax Liabilities and Liens Against Hopkins**</u>.

M. Hopkins worked as an emergency room physician and earned significant income. Before 1996, the Hopkins filed federal income tax returns and incurred tax debt that they failed to pay fully.   <u>See</u> IRS Notices of Tax Liens, Hopkins Crim. Gov. Ex. 39, filed July 16, 2012 (Doc. 69-1).   In 1996, the Hopkins took steps to avoid liability and payment.   They met and consulted with several individuals and groups that advocate recognized tax protestor arguments and tactics, and made multiple library visits.

In 1997, M. Hopkins filed an "Affidavit of Citizenship and Domicile" with the Chaves County, New Mexico, Clerk, stating that he is a citizen of the "Texas Republic," is a nonresident alien of the United States, and is not required to pay federal income tax.   M. Hopkins' Affidavit of Citizenship and Domicile, Hopkins Crim Gov. Ex. 35, filed July 16, 2012 (Doc. 69-2).   S. Hopkins filed a similar document.   <u>See</u> S. Hopkins' Affidavit of Citizenship and Domicile, Hopkins Crim Gov. Ex. 36, filed July 16, 2012 (Doc. 69-3).

The Hopkins asserted to the IRS that their compensation for labor earned was not income subject to federal income tax.   <u>See, e.g.</u>, Hopkins' 1996 Form 1040, Hopkins Crim. Gov. Ex. 152, filed July 16, 2012 (Doc. 69-4).   In furtherance of their arguments, the Hopkins filed a joint federal income tax "return" that listed "zero income" for tax year 1996, while attaching W-2's showing M. Hopkins' wages as $81,000.00 and S. Hopkins' wages as $9,000.00.   Hopkins' 1996

_____

correct assessment of your argument?

Tr. at 44:9-19 (Court)(emphasis added).   The Hopkins responded: "That's correct, Your Honor." Tr. at 44:20 (M. Hopkins).   The facts that the United States set forth in its United States' Brief Supporting its Motion for Summary Judgment, filed July 7, 2012 (Doc. 66-1)("MSJ Brief"), are therefore largely, if not completely, undisputed.   Where the Hopkins nevertheless continued to dispute a fact on other than the legal grounds that their labor is exempt from taxation at the hearing, however, the Court considers the fact disputed and determines whether there is a genuine issue of material fact in the footnotes in this factual background section.

Form 1040.   The Hopkins' Form 1040, filed jointly, for tax year 1996 reported "0" income, and attached letters and documents to support their tax positions.   See Hopkins' 1996 Form 1040 at 5. Hopkins altered the jurat, and attached three signed statements containing tax protest language: "Affidavit of Claims for Exemption and Exclusion from Gross Income of Remuneration, Wages and Withholding," "Affidavit of Citizenship and Domicile," and "Contract and Declaration of Citizenship."   Hopkins' 1996 Form 1040 Attachments, Hopkins Crim. Gov. Ex. 152, filed July 16, 2012 (Docs. 69-5 and 69-6).   Statements attached to the Hopkins 1996 tax return stated: "The income tax is voluntary.   We do not wish to volunteer."   Hopkins' 1996 Form 1040 Attachments at ¶ 8, at 6.   Also, the Hopkins stated: "We are natural born sovereigns, preamble, de jure Citizen of one of the 50 sovereign Republic, freely associated compact American states."   Hopkins' 1996 Form 1040 Attachments at ¶ 5, at 9.   The Hopkins stated that they were sovereign citizens of one of the fifty states, were "not citizen[s] of the United States," and were "not subject to jurisdiction of the United States," and filed a "Notice of Election to Terminate U.S. Taxpayer Status" and a "Declaration of Independence."   Hopkins Crim. Gov. Ex. 270, filed July 16, 2012 (Docs. 70, 70-1, 70-2, and 70-3); Hopkins Crim Gov. Ex. 37, filed July 16 2012 (Doc. 70-4).

As part of their activities designed to avoid the IRS receiving any of their income for their tax liabilities, the Hopkins set up nominees including two trust -- Guadalupe Medical Service Trust ("GMST") and Grace Trust -- and corporate shells -- Shalom Enterprises, Inc. and House of Royale, Inc.   Shalom Enterprises is an Oregon corporation, whose officers were M. Hopkins and S. Hopkins.   House of Royale is a Nevada corporation, whose only officer was S. Hopkins.   See Default Judgment Against Defendants House of Royale, Inc. and Shalom Enterprises, Inc. at 1-2, filed December 7, 2011 (Doc. 36)(ordering, adjudging and decreeing that House of Royale and Shalom Enterprises are "nominee[s]/alter ego[s] of Mark Hopkins and Sharon Hopkins").

-5-

Hopkins instructed the hospitals or physician staffing groups for which he worked to send his earnings directly to GMST and, later, to Shalom Enterprises. Trans-Mountain Emergency Physicians Group decided to honor an IRS levy for the Hopkins' unpaid income taxes that seized his May 1997 paycheck. M. Hopkins protested, saying his income was exempt. The Trans-Mountain Group's Chief Executive Officer rejected that argument, and M. Hopkins quit. See Hopkins Crim. Doc. 340; Crim. Trial Tr. at 555-560 (Sept. 23, 2010)(Dr. Beohm), filed July 16, 2012 (Doc. 71-5). The Hopkins used these nominee entities for their personal living expenses or transferred funds to other nominees, including Grace Trust and House of Royale. See Mark & Sharon Hopkins, Checks & Cash Written Between Nominee Bank Accounts, Hopkins Crim. Gov. Exs. 313, 314, filed July 16, 2012 (Docs. 71 and 71-1).

Based in part on law that zero returns are not legally considered to be tax returns, see United States v. Rickman, 638 F.2d 182, 184 (10th Cir. 1980)(holding that a tax return asserting that a taxpayer had zero income is not a valid return), the IRS disregarded the Hopkins' return and assessed the couple a frivolous filing penalty of $500.00, see Hopkins Crim. Doc. 340; Crim. Tr. at 625 (Sept. 23, 2010)(Sigler).[3] Hopkins appealed the penalty based on the same arguments that

---

[3] In addition to the United States Court of Appeals for the Tenth Circuit's opinion in United States v. Rickman, the Tenth Circuit, in deciding the Hopkins' appeal of their sentences in their criminal case, noted that the Hopkins' tax returns were "frivolous." United States v. Mark E. Hopkins and Sharon J. Hopkins, No. 11-2114, Order and Judgment, at *37 (10th Cir. Feb. 5, 2013), filed in this civil case February 6, 2013 (Doc. 162-1). Rule 32.1 of the Tenth Circuit's Rules of Appellate Procedure provides:

> **Precedential value.** The citation of unpublished decisions is permitted to the full extent of the authority found in Fed. R. App. P. 32.1. Unpublished decisions are not precedential, but may be cited for their persuasive value. They may also be cited under the doctrines of law of the case, claim preclusion, and issue preclusion. Citation to unpublished opinions must include an appropriate parenthetical notation. E.g., United States v. Wilson, No. 06-2047, 2006 WL 3072766 (10th Cir. Oct. 31, 2006) (unpublished); United States v. Keeble, 184 F. App'x. 756 (10th Cir.

they had made earlier.   Despite IRS correspondence and contact, the Hopkins refused to correctly file their 1996 federal income tax return and never filed another income tax return.   See Hopkins' Form 4340s, Hopkins Crim. Gov. Exs. 102-103, 105-107, 117-118, filed July 16, 2012 (Docs. 72, 72-1, 72-2, 72-3, 72-4, 73, and 73-1).

To discover the Hopkins' income and assets, the IRS commenced its investigation and audit that included third-party summons of bank records, financial and legal documents, third parties' Form 1099s, and witness interviews.   Reviewing the bank deposits, related financial documents and the Form 1099s, the IRS prepared substitutes for return on the Hopkins' behalf, and sent audit results for tax years 1996, 1997, 1999, 2000, and 2001 to the Hopkins.   See Hopkins Crim. Gov. Exs. 190-195, filed July 16, 2012 (Docs. 73-2, 73-4, 77, 74-1, 74-2, 74-3, 75, 75-1, 75-2, 75-3, 75-4, 75-5, 75-6, 76, 76-1, and 76-2).   The IRS sent notices of deficiency ("NODs") to both M. Hopkins and S. Hopkins for each of the years at issue.   See Hopkins Crim. Gov. Ex. 193 at 6; Hopkins Crim. Gov. Ex. 194 at 16; Hopkins Crim. Gov. Ex. 195 at 16; Hopkins Crim. Gov. Ex. 207.   In response to the NODs for 1996 and 1997, the Hopkins asserted, through their representative, that they had not filed returns or submitted to jurisdiction, and therefore had no income subject to tax.   See Letter from John B. Kotmair Jr. Re: Notice of Deficiency to James Walsh, IRS District Director (dated Sep. 5, 2000), Hopkins Crim. Gov. Ex. 208, filed July 16, 2012 (Doc. 76-4).

---

2006)(unpublished).

10th Cir. R. 32.1(A).   Under the doctrine of issue preclusion, the Tenth Circuit's finding that the Hopkins' returns were frivolous is thus binding on the Hopkins' civil case here. See In re Corey, 583 F.3d 1249, 1251 (10th Cir. 2009)("The doctrine of issue preclusion prevents a party that has lost the battle over an issue in one lawsuit from relitigating the same issue in another lawsuit.").   The Court concludes, therefore, that the Hopkins' tax returns that reflected "0" income were invalid and frivolous.

-7-

A delegate of the Secretary of Treasury assessed against, and gave notice and demand to, the Hopkins for unpaid income taxes, penalties, statutory additions, and interest for tax years 1996, 1997, 1999, 2000, and 2001.   See Hopkins' Form 4340s, Hopkins Crim. Gov. Exs. 102, 103, 105-107, 117, 118.   To date, the Hopkins have neglected, failed, and refused to pay the full amount of the federal income tax assessments for these years.   Hopkins Crim. Ex. 315, filed July 16, 2012 (Doc. 77), shows that IRS computer transcripts stated the tax liabilities in the amount of $732,811.61 that M. Hopkins owes under Count Two of the Indictment as of October 19, 2010 -- the time of his criminal trial.   See Hopkins Crim. Ex. 315.   The table below shows the tax period, the assessment date, the amounts assessed, and the total liabilities that M. Hopkins owes for these periods to October 19, 2010.

| TAX PERIOD | DATE ASSESSED | ASSESSED AMOUNT | AMOUNT DUE AS 10/19/2010 |
|---|---|---|---|
| 1996 | 12/25/2000 | $146,925.70 | $264,967.60 |
| 1997 | 12/25/2000 | $133,650.22 | $247,364.21 |
| 1999 | 12/25/2000 | $48,271.85 | $73,108.56 |
| 2000 | 12/25/2000 | $50,205.71 | $72,626.54 |
| 2001 | 06/05/2004 | $50,338.72 | $74,744.70 |
| | | **TOTAL** | $732,811.61 |

The balance due has increased since that date, and shall continue to increase by statutory additions and accruals until paid.

During 1996 and 1997 tax years, S. Hopkins had income requiring her to file federal income tax returns.   As New Mexico is a community property state, S. Hopkins also received taxable income computed on a community property basis.   S. Hopkins did not, however, file

federal income tax returns for the 1996 and 1997 tax years.   Accordingly, after reviewing the bank

deposits, related financial documents, and the Form 1099s, the IRS prepared substitutes for return

on behalf of S. Hopkins, and sent audit results and NODs for tax years 1996 and 1997 to the

Hopkins.   See Notice of Deficiency, Hopkins Crim. Gov. Ex. 207, filed July 16, 2012 (76-3).

A delegate of the Secretary of the Treasury assessed against, and gave notice and demand

to, S. Hopkins for unpaid income taxes, penalties, statutory additions, and interest for tax years

1996 and 1997.   See IRS Form 4340s, Hopkins Crim. Gov. Exs. 117, 118.   To date, S. Hopkins

has neglected, failed, and refused to pay the full amount of the federal income tax assessments for

these years.   The table below shows the tax period, the assessment date, the amounts assessed, and

the liabilities that S. Hopkins owes for these periods to October 19, 2010.   See Hopkins Crim.

Gov. Ex. 315 (stating the tax liabilities at issue in Count Two of the Indictment that S. Hopkins

owed at the time of her criminal trial).

| TAX PERIOD | DATE ASSESSED | ASSESSED AMOUNT | AMOUNT DUE AS 10/19/2010 |
|---|---|---|---|
| 1996 | 12/25/2000 | $39,914.38 | $72,496.21 |
| 1997 | 12/25/2000 | $27,794.92 | $51,174.77 |
| | | **TOTAL** | $123,670.98 |

The balance due has increased since that date, and shall continue to increase by statutory additions

and accruals until paid.   Thus, the IRS required the Hopkins to file federal income tax returns for

the tax years at issue: $242,070.00 in tax year 1996; $202,662.00 in 1997; $64,233.00 in 1999;

$74,357.00 in 2000; and $93,157.00 in 2001.   See Hopkins Crim. Gov. Ex. 192 at 4; Hopkins

Crim. Gov. Ex. 192 at 4; Hopkins Crim. Gov. Ex. 193 at 9; Hopkins Crim. Gov. Ex. 194 at 2;

Hopkins Crim. Gov. Ex. 194 at 2.[4]

On July 6, 2004, August 3, 2004, July 12, 2005, and December 13, 2005, the IRS filed Notices of Federal Tax Lien for M. Hopkins' federal income tax liabilities for the tax years at issue with the County Clerk of Eddy County, New Mexico.   On September 3, 2009, the IRS filed a Notice of Federal Tax Lien for S. Hopkins' federal income tax liabilities for tax years 1996 and 1997 with the County Clerk of Eddy County.   See Hopkins Form 668s, Notices of Federal Tax Liens, filed July 16, 2012 (Doc. 77-2).

In May, 2010, the IRS filed Notices of Federal Tax Lien against the Hopkins' nominees -- Shalom Enterprises and House of Royale -- as the Hopkins' nominees and/or alter egos for the Hopkins' federal income tax liabilities for the years at issue with the County Clerk of Eddy County.   See Nominees Form 668s, Notices of Federal Tax Liens, filed July 16, 2012 (Doc. 77-3).

## 2.    <u>The Hopkins' Real Property on Which the United States Wants to Foreclose</u>.

At a time when they owed income taxes and federal tax liens existed, the Hopkins acquired properties in the names of nominee entities to avoid IRS collection.   As part of the tax conspiracy

---

[4] Although there was contention at the hearing regarding whether res judicata precludes the Hopkins from relitigating the amount of tax reflected in the Hopkins' Forms 4340, the Court cannot soundly conclude that the validity of the Hopkins' Forms 4340 was necessary to the jury's guilty verdict, but that somehow the amount of tax liability in the tax assessments was not necessary.   Moreover, the Hopkins do not take issue with the amounts reflected on the Hopkins' Forms 4340, but rather, as discussed in Section I of the Analysis above, and in footnote 2, <u>supra</u>, contend that their income, as a whole, is "exempt" from the United States' taxing power.   <u>See e.g.</u>, Hopkins' MSJ Response ¶ F, at 4 ("Plaintiff alleges that Defendants owe the amounts due in the tables[] totaling $856,481.00.   Defendants dispute this amount as such is 'exempt' income as per 26 U.S.C. § 61 as lodged in 'except as otherwise provided in this subtitle.'"); Tr. at 44:9-20 (M. Hopkins answering that the Court is correct that they do not dispute the facts of the legal assessment; rather, their "dispute [is] about the validity of the assessment <u>from a legal standpoint</u>.")(emphasis added).   The Court thus concludes that the amount of tax liability state in the Hopkins' Forms 4340 attached to the United States' Motion for Summary Judgment was necessary to the jury's judgment in the criminal case against the Hopkins, and the Hopkins, therefore, are precluded from relitigating the amount owing in this civil lawsuit.

and evasion for which they were convicted in the United States' criminal case against them, M. Hopkins and S. Hopkins used nominees to acquire their home and adjoining real properties as a way of keeping their assets and ownership interests hidden from the IRS.   See Hopkins Crim. Gov. Ex. 331, filed July 16, 2012 (Doc. 77-4)(a plat map with the Hopkins' real estate at issue). The nominees -- Shalom Enterprises and House of Royale -- held title in their name to the four real estate tracts at issue in this case.   In April 22, 1997, M. Hopkins filed or caused to be filed with the Chaves County, New Mexico, Clerk several documents, each of which is identified as a "common law contract and declaration," and purports to establish several trusts, including the Grace Trust. See Grace Trust, Hopkins Crim. Gov. Ex. 42, filed July 16, 2012 (Doc. 78).

      a.        **Tract #1-601 N. Canyon.**

In November 2001, when the Hopkins owed federal income taxes, M. Hopkins wrote a check for $14,589.23 from the Grace Trust account as a down payment to acquire 601 N. Canyon in Carlsbad, New Mexico.   Tract #1, located at 601 N. Canyon, is more fully described as follows: "Lots 11 and 13, Block 66, Lowe Addition to the City of Carlsbad, Eddy County, New Mexico as shown on the official plat thereof on file in the office of the County Clerk of Eddy County, New Mexico," referring to MAP # 246-66-13, LOC 601 N. Canyon Street.   They used Grace Trust to hold title to the property, which served as their principal residence.

In the Fall of 2007, the Hopkins' attempt to refinance their home was temporarily delayed when the title company refused to issue a clear title, because Grace Trust was a "pure trust," and not insurable as a borrower or as an owner.   According to the title company, the home first needed to be transferred into an entity, a person, or an entity like a corporation.   S. Hopkins then directed the nominal trustees of Grace Trust to transfer title to a different nominee -- House of Royale -- to effect the mortgage acquired from Interbay Funding, LLC, and the title to 601 N. Canyon

ultimately vested from Grace Trust to House of Royale.   See Hopkins Crim. Doc. 340; Crim. Trial Tr. at 607 (Sept. 23, 2010)(Cliff Currier), filed July 16, 2012 (Doc. 78-1); Hopkins Crim Gov. Ex. 34 (Docs. 78-2, 78-3, 78-4, 78-5, and 78-6).   On May 28, 2010, a nominee Notice of Federal Tax lien was filed in the Eddy County property records against House of Royale as the Hopkins' nominee and/or alter ego for their unpaid federal income tax liabilities for tax years 1996, 1997, 1999, 2000, and 2001.   See Entity Form 688s, Notices of Federal Tax Lien.

**b.      Tract #2: 605 N. Canyon.**

In October, 2002, M. Hopkins purchased 605 N. Canyon Road in Carlsbad in the name of Shalom Enterprises for a $1,000.00 down payment on a $21,500.00 purchase price.   See Hopkins Crim. Doc. 340; Hopkins Crim. Gov. Ex. 32; Crim. Trial Tr. at 535-536 (Sept. 23, 2010), filed July 16, 2012 (Doc. 79).   Tract #2 is more fully described as follows: Lowe Addition, Block 65, LOT 9, MAP# 246-66-9, 605 N. CANYON.

**c.      Tract #3: 607 N. Canyon.**

In April, 2002, M. Hopkins purchased 607 N. Canyon Road in Carlsbad in the name of Shalom Enterprises.   See Crim. Trial Tr. at 533-534 (Sept. 23, 2010)(Hopkins Crim. Doc. 340), filed July 16, 2012 (Doc. 79-2); Hopkins Crim. Doc. Ex. 31, filed July 16, 2012 (Doc. 79-3). Tract #3, located at 607 N. Canyon Road in Carlsbad, is more fully described as follows: Lowe Addition, Block 65, LOT 7, MAP# 246-66-7, 607 N. CANYON.   On May 28, 2010, a nominee Notice of Federal Tax lien was filed in the Eddy County property records against Shalom Enterprises, as nominee/alter ego of M. Hopkins and/or S. Hopkins for the Hopkins' unpaid federal income tax liabilities for tax years 1996, 1997, 1999, 2000, and 2001.   See Nominees Form 688s, Notices of Federal Tax Lien.

**d.      Tract #4: 602 N. Canyon/108 & 110 W. Bonbright.**

-12-

In November, 2003, M. Hopkins sought to acquire 602 N. Canyon Road, as well as 108 and 110 W. Bonbright, in Carlsbad, in the name of Shalom Enterprises.   Tract #4, located at 602 N. Canyon Street and 108 & 110 W. Bonbright, is more fully described as follows: Lowe Addition, Block 65, LOT 14, Book 532, Page 230, MAP# 246-65-14, 602 N. CANYON.   Advanced Electronics, a New Mexico partnership, owned the land on a commercially zoned tract consisting of a two-bedroom home and two two-bedroom homes on one commercial corner lot.   Hopkins entered into a New Mexico real estate contract with Advanced Electronics for the property; the original note was $45,000.00 at 7% interest with a balloon payment due November 15, 2012.   On November 15, 2010, WestStar Escrow, on behalf of Advanced Electronics, sent a default notice to Shalom Enterprises for nonpayment; Shalom Enterprises owed $35,789.19 at the time and did not cure the default.

### 3.     Defendants New Mexico Department of Taxation and Revenue and Bayview Loan Servicing, LLC.

On August 15, 2006, Taxation & Revenue filed a Notice of Claim of Lien against M. Hopkins.   Bayview Loan intends to establish the validity and default on a promissory note that House of Royale made, signed in November, 2007, by S. Hopkins as director, which, under New Mexico law, was a properly perfected security interest on the real property located at 601 North Canyon.   Bayview Loan has a pending state court action against House of Royale, S. Hopkins, and the United States (IRS) in the Fifth Judicial District Court, Eddy County, State of New Mexico.   See Fifth Judicial District Court of New Mexico, Case No. D-503-CV-201100096.

### 4.     Criminal Case.

The Hopkins were indicted and convicted of conspiracy and tax evasion.   The grand jury indicted the Hopkins on one count of conspiracy and multiple counts of tax evasion.   The tax

evasion counts related to tax years 1996, 1997, 1999-2007.  In particular, Count Two of the Indictment charged the Hopkins with tax evasion for tax years 1996, 1997, 1999, 2000, and 2001. To gain the conviction on tax evasion, the United States proved beyond a reasonable doubt all elements.

In particular, to prove the first element of tax evasion, the United States proved that the Hopkins had income, subject to tax, in each year charged.  Further, with its investigations and audits, the United States provided evidence of the amounts of income that the Hopkins earned and the specific tax that was due on that income.  The IRS also introduced its Form 4340s and evidence that it made valid assessments of tax.  Hence, the jury necessarily decided that the Hopkins owe substantial income tax.

To prove tax evasion, the United States also proved the third element: that the Hopkins used nominees to evade or to defeat the tax owed.  Again, the United States was successful in presenting the evidence of the Hopkins' use of "pure" trusts and corporate shells while retaining dominion and control of these entities to funnel monies and to conceal their assets, including their home and real estate.   The jury's verdict in finding the Hopkins guilty of Count Two's tax evasion necessarily determined that the entities were nominees that the Hopkins used.

At the Hopkins' criminal trial, the United States proved that the Hopkins earned significant income, but failed to report it and used nominees in their illegal attempt to avoid paying any income tax.   The Hopkins testified at their trial.   In the Hopkins' criminal trial, the jury instructions, essential to the verdict, were provided to the jury as follows:

INSTRUCTION NO. 3

2. From at least 1996 to the present, MARK E. HOPKINS worked as an emergency room doctor for various medical staffing companies in New Mexico. Since January 1, 1996, MARK E. HOPKINS has earned at least $3,616,134 in

-14-

business income from these medical staffing companies, including the Schumacher Group, which paid him for services that he performed as an emergency room physician at hospitals in the region that includes Carlsbad Medical Center.

. . . .

4. MARK E. HOPKINS and SHARON J. HOPKINS have failed to file personal federal tax returns since tax year 1997.

5. To assist in their tax evasion scheme, MARK E. HOPKINS and SHARON J. HOPKINS created a number of entities that the couple used to conceal their assets, including:

i) Shalom Enterprises, Inc. ("Shalom Enterprises"), an Oregon corporation, whose officers were MARK E. HOPKINS and SHARON J. HOPKINS.

ii) House of Royale, Inc. ("House of Royale"), a Nevada Corporation, whose only officer was SHARON J. HOPKINS.

. . . .

v) The Grace Trust, a purported trust whose purported trustees were V.A. and S.S.

. . . .

<u>Manner and Means</u>

. . . .

10. It was a part of the conspiracy for MARK E. HOPKINS to direct his business income to a nominee to conceal his income.

11. It was a further part of the conspiracy that MARK E. HOPKINS and SHARON J. HOPKINS would transfer funds between bank accounts held in nominee names.

12. It was a further part of the conspiracy for MARK E. HOPKINS and SHARON J. HOPKINS to title real property in the names of nominees to conceal their ownership of the property.

13. It was a further part of the conspiracy that MARK E. HOPKINS and SHARON J. HOPKINS would send threatening correspondence to IRS employees to impede the ascertainment and collection of the federal income taxes that they

owed.

Overt acts

In furtherance of the conspiracy, and to effect the objects thereof, the following overt acts, among others, were committed in the District of New Mexico, and elsewhere:

. . . .

16. On or about April 15, 1997, MARK E. HOPKINS and SHARON J. HOPKINS filed an IRS Form 1040, U.S. Individual Income Tax Return, falsely stating that they had an adjusted gross income of zero and requesting a refund of all federal income tax withheld.

17. On or about April 22, 1997, MARK E. HOPKINS filed or caused to be filed with the Chaves County Clerk seven documents, each of which was identified as a "common law contract and declaration", which documents purported to establish the Grace Trust, the Shalom Trust, the Solomon Educational Trust, the Maranatha Trust, the Esteem International Trust, the Bethlehem Trust, and the Guadalupe Medical Services Trust.

. . . .

24. In December 1998, MARK E. HOPKINS directed his new employer, the Schumacher Group, to pay his business income to Shalom Enterprises.

. . . .

29. On or about November 15, 2001, MARK E. HOPKINS wrote a check for $14,589.23 from the Grace Trust account #xxxxxx8409 as a down payment for 601 N. Canyon in Carlsbad, New Mexico. Said property was used as the personal residence of MARK E. HOPKINS and SHARON J. HOPKINS through the date of this indictment.

30. On or about April 15, 2002, MARK E. HOPKINS purchased 607 N. Canyon Road in the name of Shalom Enterprises.

31. On or about October 16, 2002, MARK E. HOPKINS purchased 605 N. Canyon Road in the name of Shalom Enterprises.

32. On or about July 28, 2003, SHARON J. HOPKINS filed an Amendment to the Annual Report of Shalom Enterprises, Inc. with the Secretary of State for Oregon, listing MARK E. HOPKINS as president and SHARON J. HOPKINS as secretary.

33. On or about November 14, 2003, MARK E. HOPKINS purchased 602 N. Canyon Road as well as 108 and 110 W. Bonbright in the name of Shalom Enterprises.

34. On or about November 14, 2003, MARK E. HOPKINS and SHARON J. HOPKINS applied for an American Express credit card in the name of House of Royale, Inc.

35. On or about January 30, 2004, MARK E. HOPKINS and SHARON J. HOPKINS opened a bank account at Wells Fargo Bank, NA in the name of House of Royale, Inc., account #xxxxxx0076.

36. On or about December 29, 2006, SHARON J. HOPKINS filed articles of incorporation for the House of Royale, Inc. with the Secretary of State for Nevada.

. . . .

## Count 2

37. Paragraphs 1 through 6, and 14 through 36, above, are hereby are incorporated by reference as if realleged and recited in full.

38. From in or about 1996 up to and including the date of this indictment, in the District of New Mexico, the defendants, MARK E. HOPKINS and SHARON J. HOPKINS, did willfully attempt to evade and defeat the payment of a large part of the income tax due and owing by them to the United States of America for the tax years set forth below and in the amounts set forth below, by, among other things, using nominees to conceal their income, bank accounts, and ownership of assets.

. . . .

In violation of 26 U.S.C. § 7201.

## Counts 3-8

39. Paragraphs 1 through 6, and 14 through 36, above, are hereby incorporated by reference as if realleged and recited in full.

40. For each year set forth below, MARK E. HOPKINS and SHARON J. HOPKINS, had received taxable income in the amounts set forth below, computed on a community property basis for calendar years 2002 through 2007. Based upon said taxable income, the defendants had a substantial tax due and owing to the United States. Knowing and cognizant of the foregoing facts and the legal duty

deriving therefrom, MARK E. HOPKINS and SHARON J. HOPKINS, in the District of New Mexico, did willfully attempt to evade and defeat the assessment and payment of income taxes due and owing by them to the United States of America for each of the following calendar years by committing the following affirmative acts of tax evasion, among others: by failing to file any income tax returns on or before the due date of the tax returns, as required by law; by failing to pay those income taxes, and by, among other things, using nominees to conceal their income, bank accounts, and ownership of assets.

. . . .

In violation of 26 U.S.C. § 7201.

. . . .

INSTRUCTION NO. 7

The defendants are charged in Counts 2 through 8 with violating Title 26, Section 7201 of the United States Code. This law makes it a crime for anyone willfully to attempt to evade or defeat the payment of federal income tax. To find a defendant guilty of this crime you must be convinced that the government has proved each of the following beyond a reasonable doubt:

>   *First*: the defendant or another person owed substantial income tax;
>
>   *Second*: the defendant intended to evade and defeat payment of that tax;
>
>   *Third*: the defendant committed an affirmative act in furtherance of this intent, that is the defendant used nominees to conceal their income, bank accounts, and ownership of assets; and
>
>   *Fourth*: the defendant acted willfully, that is, with the voluntary intent to violate a known legal duty.

To "evade and defeat" the payment of tax means to escape paying a tax due other than by lawful avoidance. The Indictment alleges a specific amount of tax due. The proof, however, need not show the exact amount of the additional tax due. The government is required only to prove, beyond a reasonable doubt, that the additional tax due was substantial. Whether the amount is "substantial" turns on whether under the surrounding circumstances the amount of the deficiency would be significant to an ordinary person.

. . . .

INSTRUCTION NO. 9

-18-

The government has contended that the defendants owed taxes to the United States. For Count 2, the government contends that the defendants evaded the payment of their federal income tax liability for tax years 1996, 1997, 1999, 2000, and 2001. The government has put forth evidence of assessments for each of these years.

An assessment is simply a bookkeeping entry by the IRS that shows that the defendant owed money to the United States. In this case, an IRS agent prepared a substitute for return for the defendants for years 1996, 1997, 1999, 2000, and 2001. After the substitute for return was prepared, the IRS was able to prepare an assessment, which included unpaid federal income taxes and certain penalties.

Once some evidence is introduced demonstrating that the defendants received unreported income, the jury may consider this as evidence of a tax due and owing. The defendants may then put forth evidence that shows that this tax liability does not exist.

For Counts 3 through 8, the government contends that the defendants evaded the payment of their federal income tax liability for tax years 2002, 2003, 2004, 2005, 2006, and 2007. You may find the defendants had a tax due and owing based on the testimony at trial. . . .

United States v. Mark E. Hopkins and Sharon J. Hopkins, No. 09-0863 MCA, Court's Jury Instructions at 4-12, and 19-20, filed Sept. 28, 2010 (Doc. 260)("Court's Jury Instruction in No. 09-0863 MCA").   On September 29, 2010, after a seven-day trial, the jury found both M. Hopkins and S. Hopkins guilty of tax evasion -- Counts 2-8 of the Indictment, Hopkins Crim. Gov. Ex. 315, filed in No. 09-0863 Apr. 9, 2009 (Doc. 2), filed in this civil case July 16, 2012 (Doc. 67-4).   See United States v. Mark E. Hopkins and Sharon J. Hopkins, No. 09-0863 MCA, Redacted Verdict as to M. Hopkins at 1-2, filed in No 09-0863 Sept. 29, 2010 (Doc. 270), filed in this civil case July 16, 2012 (Doc. 67-2); United States v. Mark E. Hopkins and Sharon J. Hopkins, No. 09-0863 MCA, Redacted Verdict as to S. Hopkins at 1-2, filed in No. 09-0863 Sept. 29, 2010 (Doc. 272), filed in this civil case July 16, 2012 (Doc. 67-3).

The jury actually and necessarily decided that the Hopkins owed federal income taxes for

-19-

years 1996, 1997, 1999, 2000, and 2001 that the IRS had assessed.   In proving that the Hopkins willfully attempted to evade and defeat payment of income taxes, the United States established another element of tax evasion: that the Hopkins used nominees to conceal their income, bank accounts, and ownership of assets.

M. Hopkins and S. Hopkins each testified, and presented witnesses and evidence.   The Hopkins had a "full and fair opportunity to litigate."   The Honorable M. Christina Armijo, United States District Court Chief Judge for the District of New Mexico, entered judgment and sentenced the Hopkins.   See Judgment, Hopkins Crim. Doc. 308, filed July 16, 2012 (Doc. 79-4). Judge Armijo ordered restitution to be paid to the IRS in the amount of $1,744,222.26.   See Judgment at 1.

Importantly, the Hopkins appealed only their sentences, and not their convictions, to the United States Court of Appeals for the Tenth Circuit.   See M. Hopkins' Opening Brief at 2, Case 11-2114 (10th Cir.)(Doc. 01018784918)(stating that the sole issue presented for review is "[w]hether the district court erred in imposing a two level enhancement under U.S. Sentencing Guidelines § 3C1.1 for obstruction of justice"); S. Hopkins' Opening Brief at 1-2, Case 11-2115 (10th Cir.)(Doc. 1018800195)(positing three issues: two for enhancement and one for right to counsel).   In light of the fact that the Hopkins did not appeal their tax evasion or conspiracy conviction to the Tenth Circuit, but appealed only the enlargement of their sentences, their tax conviction is final.[5]

## PROCEDURAL BACKGROUND

---

[5]   Pursuant to rule 201 of the Federal Rules of Evidence, the Court takes judicial notice of specific pleadings and exhibits in the Hopkins' criminal case.   The Court may take judicial notice of docket entries, because rule 201 authorizes a court to take judicial notice of an adjudicative fact not subject to reasonable dispute.   See e.g., In re Indian Palms Assoc., 61 F.3d 197, 205 (3d Cir. 1995).

The United States commenced this lawsuit against the Hopkins and the other co-Defendants pursuant to 26 U.S.C. §§ 7401, 7402, and 7403, to reduce to judgment the outstanding tax assessments against the Hopkins, "and to recover the unpaid federal taxes, penalties and interest assessed against them by foreclosure of federal tax liens encumbering their interest in certain real property located in Eddy County, New Mexico."   United States' Complaint ¶ 1, at 1, filed May 13, 2011 (Doc. 1)("Complaint").   The Court granted the United States default judgment in this case against both entities as nominees.   Specifically, on December 7, 2011, the Court granted the United States' Motion for Default Judgment against House of Royale and Shalom Enterprises.   See Default Judgment Against Defendants House of Royale, Inc. and Shalom Enterprises, Inc. (Doc. 36)("Default Judgment").   According to the Default Judgment, House of Royale is the Hopkins' nominee/alter-ego that is holding title only to Tract #1, the residential property for the real owners, the Hopkins.   Also according to the Default Judgment, Shalom Enterprises is the Hopkins' nominee/alter ego that is holding title only to the properties Tract #2, Tract #3, and Tract #4 -- without prejudice to Advanced Electronics -- for the real owners, the Hopkins.   See Default Judgment at 2.

The United States, on behalf of the IRS, filed its Motion for Summary Judgment pursuant to rule 56 of the Federal Rules of Civil Procedure and moves the Court to grant summary judgment as follows: (i) that the United States grant the United States judgment such that M. Hopkins is indebted to the United States for $732,811.61 as of October 19, 2010, for the federal income taxes assessed against him for the years 1996, 1997, 1999, 2000, and 2001, plus interest and all statutory additions provided by law until paid; (ii) that the Court grant the United States judgment such that S. Hopkins is indebted to the United States for $123,670.98 as of October 19, 2010, for the federal income taxes assessed against her for the tax years 1996 and 1997, plus interest and all statutory

additions provided by law until paid; (iii) that the Court order, adjudge, and decree that the House of Royale, Shalom Enterprises, and the Grace Trust, are the Hopkins' nominees, alter egos, transferees, agents, and/or holders of their beneficial interest in Tracts 1, 2, and 3; (iv) that the Court order, adjudge, and decree that the United States has valid liens in Tracts 1, 2, and 3; (v) that the Court order the foreclosure of such IRS tax liens, that Tracts 1, 2, and 3 be sold in accordance with the law and the Court's practices, and that the proceeds of the sale be distributed in accordance with the Court's findings and the United States' rights; and (vi) that Advanced Electronics and not Shalom Enterprises or the Hopkins, who failed to pay the amounts required under the contract, owns Tract 4, located at 602 N. Canyon, Carlsbad, and 108 & 110 W. Bonbright, Carlsbad, and that Shalom Enterprises and the Hopkins have no rights or interests in the property.   See Motion for Summary Judgment at 1-2.

The United States contends that it is entitled to summary judgment as a matter of law, because there is no genuine issue of material fact.   See Motion for Summary Judgment at 1.   In support of their Motion for Summary Judgment, the United States argues that res judicata applies to any assertion by the Hopkins that they do not owe substantial income tax, pointing out that to have proved that the Hopkins were guilty of tax "evasion," one of the elements that the United States was required to prove was that the Hopkins owe substantial income tax.   MSJ Brief ¶ 1, at 1-2.   The United States asserts that it proved that the Hopkins used the nominees to conceal their income, bank accounts, and ownership of assets -- another element of tax evasion -- in the Hopkins' criminal case by proving that the Hopkins "willfully attempted to evade and defeat payment of income taxes."   MSJ Brief ¶ 2, at 2.   The United States contends that res judicata thus applies to any assertion by the Hopkins that the United States cannot foreclose on the tracts of land held by the nominees -- Shalom Enterprises and House of Royale.   See MSJ Brief ¶ 2, at 2-3.

The United States asserts: "With the Hopkins' convictions and the fact that this Court has granted

the United States default judgment in this case against both entities as nominees, the United States

is entitled to summary judgment on the two issues presented."   MSJ Brief ¶ 2, at 3.

The United States argues that it is entitled to judgment under the res judicata doctrine, as

the jury found in convicting the Hopkins of tax evasion that the United States proved beyond a

reasonable doubt that the Hopkins committed tax evasion and also that the United States proved

the validity of the IRS' tax assessments on which the IRS now seeks to foreclose.   See MSJ Brief

at 13-15.   The United States asserts:

> The Tenth Circuit has adopted the "transactional" approach to determine
> what constitutes a "cause of action" for res judicata.   Wilkes[ v. Dep't of Emp't
> Div. of Labor Standards], 314 F.3d [] [501] 504 [(10th Cir. 2002)].   Under this
> approach, a cause of action encompasses "all rights of the plaintiff to remedies
> against the defendant with respect to all or any part of the transaction, or series of
> connected transactions, out of which the action arose." Id.

MSJ Brief at 14 n.46.   The United States thus contends that the only issue left for the Court is

whether the IRS' liens are valid and that the IRS can foreclose on the liens, as to which, it asserts,

there is no material dispute.

The United States points out that, under the Internal Revenue Code, Title 26 of the United

States Code ("IRC"), the IRS Forms 4340s for the Hopkins for tax years 1996, 1997, 1999, 2000,

and 2001 are prima facie evidence of tax liability.   See MSJ Brief at 16 (citing United States v.

Silkman, 220 F.3d 935, 937 (8th Cir. 2000); United States v. Voorhies, 658 F.2d 710, 715 (9th Cir.

1981)).   The United States cites to 26 U.S.C. § 6321 for the proposition that Hopkins' federal tax

liens arose automatically against them on the day the IRS made the assessment, and that the liens

are effective against all of the Hopkins' property rights whether existing or acquired after the liens

arose, and that they remain valid and enforceable until the underlying debt is satisfied.   See MSJ

-23-

Brief at 16 (citing <u>Texas Commerce Bank-Fort Worth, N.A. v. United States</u>, 896 F.2d 152, 161 (5th Cir. 1990)).   The United States contends that it is thus entitled to summary judgment in its favor for the amounts reflected in the 4340s for the Hopkins.   <u>See</u> MSJ Brief at 17-18.   The United States asserts that, because the § 6321 statutory lien attaches to all interests in property whether owned in December 2000, the time at which the IRS lien for the amount owing from 1996 and 1997 attached, or acquired afterward, it is entitled to foreclose on the following tracts of land to satisfy the liens: (i) 601 N. Canyon, acquired in November 2001; (ii) 605 and 607 N. Canyon, acquired in October and April of 2002 respectively, and (iii) 602 N. Canyon St., 108 W. Bonbright, and 110 W. Bonbright, acquired in November 2003.   <u>See</u> MSJ Brief at 17-19.   In regards to the rights of the Hopkins' other creditors -- Taxation & Revenue and Bayview Loan -- the United States notes:

> [T]he IRS liens predate those of the State of New Mexico; the state's claims, therefore, are junior to the IRS claims and would take after the IRS liens have been satisfied -- an unlikely event. As to Bayview's claims that arise from its refinancing efforts in 2007 with respect to Tract #1 at 601 N. Canyon, the United States and Bayview have agreed that the IRS liens are entitled to and shall be foreclosed against the property, but that distribution of sale proceeds after costs, await further stipulation of these parties for a future order of the Court.

MSJ Brief at 19.

In regards to the Hopkins' arguments, the United States asserts that M. Hopkins takes the position that, "since the IRS has not pointed to a single statute that he recognizes, [M.] Hopkins has refused to file federal income tax returns."   MSJ Brief at 20.   The United States argues that the Court should find that the Hopkins' tax arguments lack a sound basis in the law, because "[t]he Tenth Circuit in particular has dispatched with tax protestors repeatedly for clinging to arguments like those made by the Hopkins."   MSJ Brief at 20 (citing <u>Wheeler v. C.I.R.</u>, 521 F.3d 1289 (10th Cir. 2008); <u>Lonsdale v. United States</u>, 919 F.2d 1440 (10th Cir. 1990)).   The United States

contends that the Hopkins' tax arguments "fall into most of the[] categories" of arguments against taxing income that the Tenth Circuit has analyzed and rejected, and thus so should the Court. MSJ Brief at 21.  The United States argues that "[e]very taxpayer has a legal duty to maintain accounting records which enable him to file a tax return . . . . [, and] [a] taxpayer who has abandoned the advantage of mathematical precision by failing to keep adequate records cannot complain [about] the Commissioner's assessment[s]."  MSJ Brief at 21-22 (quoting Jones v. Commissioner, 903 F.2d 1301, 1303 (10th Cir. 1990)).  The United States thus asks the Court to reject any such arguments the Hopkins may assert.

On August 6, 2012, Bayview Loan filed its Defendant Bayview Loan Servicing's Response to Plaintiff's Motion for Summary Judgment.  See Doc. 95 ("Bayview's MSJ Response").  Bayview Loan does not oppose the Plaintiff's relief sought in paragraphs one and two of their Motion for Summary judgment -- that judgment should be entered against the Hopkins to reflect their indebtedness to the United States.  Bayview's MSJ Response ¶ 1, at 1.  It argues, however, that it opposes the United States' relief sought in paragraph three of its Motion for Summary Judgment.  See Bayview's MSJ Response ¶ 2, at 1.  Bayview Loan notes that the United States relies upon the Default Judgment, which the Court entered to support its contention that House of Royale and Shalom Enterprises M. Hopkins' nominees and/or alter-egos, but points out that the Court did not enter the Default Judgment against it.  See Bayview's MSJ Response ¶ 2, at 1.  Bayview Loan asserts that there is thus no evidence in the record that the United States sought or obtained judgment against Bayview Loan establishing that M. Hopkins' pre-existing IRS tax liens should be prior and superior as against Bayview Loan concerning the property at 601 N. Canyon.  See Bayview's MSJ Response ¶ 1, at 1-2.  It contends that the original lender, InterBay Funding, could not have known that the borrower, House of Royale, was M. Hopkins'

alter ego or nominee, because, "[a]s evidenced by the copy of Bayview's Note and Mortgage . . . , the borrower on the subject loan was House of Royale, Inc., through Sharon Hopkins as its director . . . . [and] the loan was guaranteed by Sharon J. Hopkins, individually."   Bayview's MSJ Response ¶ 2, at 2.   Bayview Loan asserts that, because there is no indication in the loan documents that M. Hopkins was associated with the House of Royale or the loans, there is a genuine issue of material fact whether the IRS' lien is superior to that of Bayview Loan's.   See Bayview's MSJ Response ¶ 2, at 2.   Bayview Loan states that, in an effort to resolve their differences without adding to the expense of this litigation, it has agreed with the United States "that Plaintiff and Bayview are both entitled to foreclose on their liens against [] 601 N. Canyon, and have agreed upon an equitable division of the proceeds of the sale of the property." Bayview's MSJ Response ¶ 3, at 2.   Should the Court not approve the terms of this settlement agreement, Bayview Loan ask the Court for an additional opportunity to present evidence whether the IRS' liens are superior to those of Bayview Loan's.   See Bayview's MSJ Response ¶ 4, at 2-3. Bayview Loan states that it does not further object to any relief that the United States is seeking in its Motion for Summary Judgment.   See Bayview's MSJ Response ¶ 4, at 3.

On August 13, 2012, the Hopkins filed their Defendant's Rebuttal to Plaintiff's Motion for Summary Judgment.   See Docs. 96 and 97[6] ("Hopkins' MSJ Response").   The Hopkins assert that their Hopkins' MSJ Response shows that: (i) there are genuine factual disputes; (ii) there are issues in the case which were not litigated at the Hopkins' criminal trial and are not precluded

---

[6] M. Hopkins and S. Hopkins each filed a separate response in opposition to the United States' Motion for Summary Judgment.   See Doc. 96 (M. Hopkins' response in opposition); Doc. 97 (S. Hopkins' response in opposition).   Aside from S. Hopkins' signature line reading "Sharon Hopkins with Permission," however, the briefs and the attached exhibits and documents are identical.   The Court therefore refers to the two responses collectively as the Hopkins' MSJ Response, as both Hopkins assert the identical arguments.

under the doctrine of res judicata; (iii) there are inconsistencies in the United States' arguments; (iv) the United States misapplies tax laws to the phrase "exempt income;" (v) the jury did not find the amount of tax owed as <u>S. Union Co. v. United States</u>, No. 11-94, 132 S. Ct. 2344 (June 12, 2012), requires; (vi) the discovery necessary for the case has not been completed; (vii) the Hopkins' criminal trial excluded witnesses that would be allowed in the trial here; (viii) the Hopkins' criminal trial disallowed evidence that would be admissible and relevant here; and (ix) the United States mischaracterizes rights as "Tax Protestor argument."   Hopkins' MSJ Response at 1.   The Hopkins note that the Tenth Circuit has stated that in "a Motion for Summary Judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, and surmise."   Hopkins' MSJ Response at 2 (quoting <u>Bones v. Honeywell Int'l, Inc.</u>, 366 F.3d 869, 875 (10th Cir. 2004)).   They also point out that the Court, as a district court deciding a summary judgment motion, "must construe the facts 'in the light most favorable to the non-moving party.'" Hopkins' MSJ Response at 2 (quoting <u>Duvall v. Ga-Pac. Consumer Prods. L.P.</u>, 607 F.3d 1255, 1259 (10th Cir. 2010)).

The Hopkins argue that the United States' assertion that the indebtedness the Hopkins allegedly owe arose from income is without a sound basis in the law, because they contend that the income that they received from 1996 on was taxable income, but was exempt from taxation under the United States Constitution.   <u>See</u> Hopkins' MSJ Response ¶ A, at 2-3.   They argue that the United States' failure to recognize the income as exempt contradicts the United States' position: "Every Substitute for Return [], Notice of Deficiency [], Notice of Assessment and Demand for Payment [], liens, levies, indictment, conviction, and attempt at foreclosure has been tainted by a flagrant disregard of a claimed exemption on income earned when exercising a constitutionally guaranteed fundamental right."   Hopkins' MSJ Response ¶ A, at 3 (citing 26 C.F.R. §

-27-

1.861-8T(e)(ii) and (iii)).   The Hopkins contend that, where the United States asserts the Hopkins effectively did not file tax returns as the filed tax returns were legally invalid, they "have never 'avoided liability' for any taxable income.   Defendants proved that the income in question was 'exempt.'"   Hopkins' MSJ Response ¶ D, at 3.   The Hopkins dispute that they owe the United States the amounts listed in the tables in its MSJ Brief, asserting that "this amount . . . is 'exempt' income as per 26 U.S.C. § 61, as lodged in 'except as otherwise provided in this subtitle.'" Hopkins' MSJ Response ¶ F, at 4.   The Hopkins contend that, because M. Hopkins was taxed for 1996 and 1997 on 100% of his taxable income, and S. Hopkins was taxed on her 50% as community property, they "have been taxed at 150% of the allowable statutory amount on the alleged 'taxable income' which forms the basis of the tables in the years 1996 and 1997." Hopkins' MSJ Response ¶ I, at 4.

The Hopkins argue that res judicata does not apply, because the criminal forum was not a proper forum in which the Hopkins could litigate the issue "as to what income is considered 'Exempt' . . . nor was evidence put forth to support Defendants' arguments . . . ."   Hopkins' MSJ Response ¶ 2, at 4.   They assert that they were not allowed at their criminal trial to put forth evidence regarding the amount of their income that is exempt, as 26 C.F.R. § 19.22(b)-1 uses that term.   See Hopkins' MSJ Response ¶ 2, at 5.

The Hopkins point to various statements in the United States' Motion for Summary Judgment and the corresponding MSJ Brief that they contend are inconsistent.   See Hopkins' Response ¶ 3, at 5.   The Hopkins contend that the United States' factual assertion that "Hopkins filed a joint federal income tax return that listed zero income," and that "Hopkins refused to correctly file their 1996 federal income tax return and never filed another federal income tax return," is inconsistent with its statement that "Sharon Hopkins failed to file federal income tax

returns for the 1996 and 1997 tax years."   Hopkins' MSJ Response ¶ 3, at 5.   The Hopkins also

contend that the United States' assertion that it is "settled law that zero returns are not legally

considered to be tax returns," MSJ Brief ¶ 6, at 6 (citing United States v. Rickman, 368 F.2d 182

(10th Cir. 1980)), is incorrect, in that the law is not settled that a zero return is not legally a tax

return, see Hopkins' MSJ Response ¶ 3, at 5 (citing United States v. Long, 618 F.2d 74 (9th Cir.

1980); United States v. Moore, 627 F.2d 830 (7th Cir. 1980)).

The Hopkins note that, in response to the United States' contention "that every dollar

earned by [the Hopkins] was 'taxable income,'" the Hopkins note that they "will argue in their

Case-in-Chief that all or a portion of such may be 'exempt income' as per . . . Follett v.

McCormick, 321 U.S. 573 (1944) and Murdock v. Pennsylvania, 63 S. Ct. 870 (1943)."   Hopkins'

MSJ Response ¶ 4, at 6.   They assert that their income is exempt from gross income under the

Sixteenth Amendment, 26 U.S.C. § 61, 26 U.S.C. § 861, and 26 C.F.R. § 1.861-8T(d)(2)(ii).   See

Hopkins' MSJ Response ¶ 4 at 6-7.   The Hopkins also argue that, pursuant to the Supreme Court

of the United States' 2012 opinion in S. Union Co. v. United States, 132 S. Ct. at 2344, requiring a

jury trial on any imposition of criminal fines, the jury did not find the amount of tax owed and the

issue has therefore not been adjudicated.   See Hopkins' MSJ Response ¶ 5, at 7.   They assert

further that, because they have only recently received "a very limited discovery" five months after

it was requested, the United States, in bad faith, has placed the Hopkins at a disadvantage.

Hopkins' MSJ Response ¶ 6, at 7-8.   The Hopkins contend that, as the United States' filing of its

Motion for Summary Judgment only eight days after serving the discovery evince, the delay in

discovery was in bad faith.   See Hopkins' MSJ Response ¶ 6 at 8.

The Hopkins additionally argue that the Court should deny the Motion for Summary

Judgment, because Joe Banister, a witness that they tried to call at their criminal trial, but who was

excluded after a hearing under <u>Daubert v. Merrell Parms., Inc.</u>, 509 U.S. 579 (1993),[7] will be allowed to testify in this civil case under rule 28 of the Federal Rules of  Civil Procedure.  <u>See</u> Hopkins' MSJ Response ¶ 7, at 8.   They assert that they will also be allowed evidence in this civil trial, "including affidavits and historical (law) evidence, which was disallowed by the Court" in their criminal trial.   Hopkins' MSJ Response ¶ 8, at 9.   Last, they argue that the United States, "in its attempt to dispose of Defendant's tax protestor arguments," mischaracterizes their rights and imputes alleged arguments which they assert are mischaracterizations of their arguments.   <u>See</u> Hopkins' MSJ Response ¶ 9, at 9-10.   The Hopkins point out that, where the United States asserts that the Hopkins espouse that the United States does not have the power to tax wages or individuals, they argue, rather, that the United States "can tax all taxable income.  BUT it CANNOT tax 'exempt income.'"  Hopkins' MSJ Response ¶ 9, at 10.   Similarly, the Hopkins assert that, where the United States argues that they contend that wages are not income, the Hopkins concede that "[w]ages are income," but they contend that "not all income is taxable income."  Hopkins' MSJ Response ¶ 10, at 11.   In response to the assertion that the Hopkins espouse that tax is voluntary, the Hopkins' reply: "Income tax is not voluntary.   Income tax is

---

7 In <u>Daubert v. Merrell Pharms., Inc.</u>, the Supreme Court of the United States set forth the standard required for a district court to allow expert testimony pursuant to rule 702 of the Federal Rules of Civil Procedure. A hearing under <u>Daubert v. Merrell Pharms., Inc.</u> refers to a hearing in which the district court acts as gatekeeper to ensure that expert testimony at trial is sufficiently reliable. As the Court has previously noted:

> Before allowing expert testimony, the Court must ensure that the testimony meets the standards the Supreme Court of the United States set forth in <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579 -- often done by a hearing on whether the expert and the expert report, disclosed pursuant to rule 26(a)(2), meet this standard.

<u>Montoya v. Sheldon</u>, CIV 10-0360 JB/WDS, 2012 WL 5353493, at *13 (D.N.M. Oct. 7, 2012)(Browning, J.).

mandatory on all taxable income."   Hopkins' MSJ Response ¶ 10, at 11.   The Hopkins assert:

> Plaintiff claims that Defendant's arguments fail in most of 'these categories' (Lonsdale arguments) and thus should be rejected.   Defendant agrees that IF Defendant was making those arguments, they should be rejected.   However, Defendants HAVE NOT ACCEPTED SUCH ARGUMENTS.   Plaintiff has assumed incorrectly, and has predicated [its] entire argument on a misconception and error.
>
> Plaintiff has been misinformed because Defendants have NEVER had the opportunity to bring THEIR true arguments before the Court or a jury.   Plaintiff's ignorance of Defendants' real arguments on this matter is evident.

Hopkins' MSJ Response ¶ 10, at 11.   The Hopkins ask that the Court not grant the Motion for Summary Judgment, because, as discovery has not been completed, it is not ripe, and because "a trier of fact [could] resolve this case either way . . . ." Hopkins' MSJ Response at 12.

On August 22, 2012, the United States filed its MSJ Reply.   The United States argues that the Hopkins' compensation earned as a physician is income subject to tax and not exempt.   See MSJ Reply at 1.   The United States asserts that the Hopkins hold the "erroneous belief," held by many tax protestors, that there is allegedly no taxable profit or gain when a person exchanges labor for money, because earnings from labor do not come within the statutory definition of gross income.   MSJ Reply at 1.   The United States contends that, like many tax protestors, the Hopkins support their argument with "inapplicable statutes or Treasury regulations, some dealing with corporate tax or the 1939 tax code long since replaced, as well as a smattering of lines from dicta in ancient court decisions."   MSJ Reply at 1 (citing, as an example, the Hopkins' MSJ Reply ¶ 4). The United States argues that the idea that earnings from labor is not taxable income, or is exempt income, has been "universally rejected by courts everywhere and the Tenth Circuit in particular." MSJ Reply at 1-2 (citing Lonsdale v. United States, 919 F.2d at 1440).

The United States asserts that, for federal income tax purposes, gross income means

income from whatever source derived and expressly includes compensation for services, no matter what form payment for services may take.   See MSJ Reply at 2 (citing 26 U.S.C. § 61(a)(1)). The United States refers the Court to M. Hopkins' testimony at his criminal trial as an example of M. Hopkins' tax protestor argument:

> Well, due to the fact that I was exercising a fundamental right to work, and that work was an even exchange, there was no increase or gain. And, according to what I understood, that was exempt income. That was money coming in that was exempt and was to be excluded before you ever got to gross receipts. When you exercise your fundamental right, those are nontaxable. Government can't tax your right to work or the exchange that you get for labor.
>
> . . . .
>
> We know that compensation for labor in the private sector by a citizen of one of the 50 sovereign states is not income as lawfully defined. Income as defined in law is limited to gains and profits severed from capital and reinvested.

Hopkins Crim. Doc. 336, Trial Transcript at 50:3-7, 51:11-19 (taken Sept. 27, 2010)(M. Hopkins), filed August 22, 2012 (Doc. 102-1).   The United States contends that these tax protestor arguments were fully contested before the jury in the course of the Hopkins' criminal trial, and the jury found that the United States had proven, beyond a reasonable doubt, "each element . . . including the first element of tax evasion -- that the Hopkins had income subject to tax, and owed substantial income tax."   MSJ Reply at 3.   The United States asserts that the jury also found that the Hopkins "had $242,070 in gross income in tax year 1996; $202,662 in 1997; $64,233 in 1999; $74,357 in 2000; and $93,157 in 2001."   MSJ Reply at 3-4.   These arguments, having been raised and decided by the jury in their criminal trial, the United States contends, should be res judicata and collaterally estop the Hopkins' efforts to assert to the contrary in this civil case.   See MSJ Reply at 4.

In response to the Hopkins' assertion that the United States is incorrect that they failed to

file a 1996 income tax return, the United States "admits that such a form was submitted to the IRS and produced a copy of it . . . . It was not a valid income tax return . . . ."   MSJ Reply at 5.   The United States points to Bachman v. Commissioner, 283 F. App'x 636 (10th Cir. 2008), contending that the Tenth Circuit held that federal income tax returns indicating that the taxpayer had no income were not valid returns "because a return that asserts no income is not a valid return."   MSJ Reply at 5.   The United States asserts that, pursuant to Bachman v. Commissioner and United States v. Rickman, 638 F.2d 182 (10th Cir. 1980), "the Court may hold that Hopkins' Form 1040 for 1996 was not a valid return . . . ."   MSJ Reply at 6.   The United States argues that, because the IRS at all times considered the 1996 Form 1040 invalid, whether the Court finds the 1996 return valid is not a material issue in the resolution of the case. See MSJ Reply at 6.

The United States argues that the "Hopkins' Form 1040 for 1997 Is A Myth."   MSJ Reply at 6.   It points out that the Hopkins fail to refer to evidence in the record to support that they filed a tax return in 1997, whereas, the United States relies upon the declaration of an IRS agent that the IRS never received such a tax form from the Hopkins or their attorneys.   See MSJ Reply at 6. The United States asserts that, because any tax return filed by the Hopkins would have represented a zero return and the IRS would have thus treated it as another invalid return, whether the Hopkins filed a 1997 tax return is not material to the Court's determination of summary judgment.   See MSJ Reply at 6.

In reply to the Hopkins' contention that they never avoided liability for any taxable income, the United States asserts that Judge Armijo noted at their sentencing hearing that "the trusts were created . . . to avoid payment and as part of a scheme to avoid payment of the federal and state taxes and also to evade the tax laws."   MSJ Reply at 7 (quoting Transcript of Sentencing Hearing 14:7-16 (taken May 17, 2011)(Court), filed August 22, 2012 (Doc. 102-3)).   The United

-33-

States contends that, "[w]hether they accept the term 'avoid' or not, it remains that Hopkins' tax evasion has been confirmed and their denials do not create genuine issues of material fact here." MSJ Reply at 7.   In response to the Hopkins' contention that the United States never proved the substance of any discussions at any alleged tax defier meetings that the Hopkins attended, the United States asserts that "the testimony of Mark and Sharon Hopkins at the criminal trial was more than sufficient to detail what was discussed by the tax defier groups and meetings."   MSJ Reply at 7.   The United States argues that, regardless whether the United States has met its burden to prove what was said at these meetings, what was discussed at these meetings is not material to any genuine issue in the case, and the Court nevertheless should grant summary judgment in its favor.   See MSJ Reply at 7.

The United States asserts that the Hopkins' contention that the United States did not credit the $130,000.00 seized by the IRS and the $32,383.00 paid to the IRS to the amount they owe is without a sound basis in the facts, because the amount reflected in the United States' pleadings is the amount owed as of October 19, 2010, and the seizure of $130,000.00 was applied in December of 2010.   See MSJ Reply at 8.   The United States notes that the $32,383.00 paid to the IRS in 1996 was posted and is reflected in the IRS Transcripts and the IRS Forms 4340 as a withholding credit with $16,191.00 credited to each of the Hopkins' account.   See MSJ Reply at 8.   In response to the Hopkins' contention that the IRS assessments for tax years 1996 and 1997 are incorrect, because they tax each of the Hopkins on one hundred percent of their individual income and fifty percent of the spouse's income, the United States asserts that it is the correct accounting method used by the IRS where a couple fails to file a valid tax return and thus fails to file as married filing jointly.   See MSJ Reply at 8-9.   The United States contends:

Each IRS assessment is legally correct where neither defendant filed a valid tax

return, combining their income and electing to be taxed on a "married, filing joint" tax rate and to be jointly and severally liable for the taxes. To gain that option, Hopkins must file a valid Form 1040 and elect the "married, filing joint" tax status. Consequently, the Hopkins' argument does not create a genuine issue of material fact and the United States is entitled to summary judgment against Mark Hopkins for the taxes assessed against him and is entitled to summary judgment against Sharon Hopkins for the taxes assessed against her.

MSJ Reply at 9-10 (internal footnote omitted).

The United States argues that the Hopkins' argument that res judicata does not apply to the amount owing under S. Union Co. v. United States, 132 S. Ct. at 2344, because the jury did not find the amount owing, is without a sound basis in the facts. See MSJ Reply at 10. The United States asserts that Count II of the Indictment expressly required the jury to find, and the jury did in fact find, that the Hopkins "did willfully attempt to evade and defeat the payment of a large part of the income tax due and owing by them to the United States," for the exact amounts that the United States lists in its MSJ Brief. MSJ Reply at 10-11. Even if res judicata did not apply to the amount owing, the United States asserts that it has provided competent summary judgment evidence of the Hopkins' income, the IRS assessments, and the tax liabilities due to carry its burden. See MSJ Reply at 11. The United States contends: "In contrast, the Hopkins have not filed a valid return, nor offered competent summary judgment evidence to challenge the assessments and create a genuine issue of material fact, but, instead, have made only self-serving statements with their faulty, tax defier belief that they had no taxable income to report." MSJ Reply at 11.

The United States replies to the Hopkins' objection to the Court granting summary judgment when there are still unresolved discovery issues, arguing that these issues "do[] not create a genuine issue of material fact to bar summary judgment." MSJ Reply at 11. Similarly, as to the Hopkins' contention that the Court should not grant summary judgment because the

Hopkins can have witnesses testify in this civil case whom they were not allowed to present at the criminal trial, the United States responds that "this argument presents no fact issue to deprive the United States of its entitlement to summary judgment."   MSJ Reply at 11-12.   The United States asserts that the Hopkins' contention that their arguments are separate and distinct from the arguments made by the defendants in <u>Lonsdale v. United States</u> is without a sound basis in the law or the facts, as M. Hopkins made those same arguments at the Hopkins' criminal trial, and the distinctions that the Hopkins makes in their response to the Motion for Summary Judgment are not substantive legal, distinctions, but rather pedantic.   <u>See</u> MSJ Reply at 12-13.   The United States thus argues that there is no dispute as to any material fact in the case and that it is entitled to judgment based on the record as a matter of law.   <u>See</u> MSJ Reply at 13.

On September 4, 2012, the Hopkins filed their Motion for Surreply, which the Court granted during the hearing on the Summary Judgment Motion, <u>see</u> Tr. at 7:23-9:19 (Court, Lena, M. Hopkins, S. Hopkins), and included the surreply within the Motion for Surreply.   The Hopkins assert that the surreply is necessary, because the United States did not quickly respond to the Hopkins' requests to provide the Hopkins with the requested IRS employee information.   Had they done so, the Hopkins note, the arguments set forth in the Motion for Surreply would have been asserted in their Hopkins' MSJ Response.   <u>See</u> Motion for Surreply at 1-3.   The Hopkins assert that the instructions provided to IRS employees regarding Form 1040 returns does not require them to mail a Form 1040 to taxpayers and does not state that taxpayers are required to file Forms 1040.   <u>See</u> <u>Motion for Surreply</u> at 4.   The Hopkins assert that the instructions do not so provide, because the Hopkins are not, pursuant to 26 U.S.C. § 6001, liable for the tax imposed. <u>See</u> <u>Motion for Surreply</u> at 4-5.

The Hopkins point out that the United States "once again can not argue the issues at hand

without resorting to several pejoratives in the first sentence.   The Government immediately

mischaracterizes our beliefs."   Motion for Surreply ¶ A, at 5-6.   The Hopkins state:

> [P]lainly . . . . Compensation for Labor - any kind of labor exercised in a common
> occupation in one of the 50 contiguous states is "Exempt" from Federal taxation
> because it is earned while engaging in a Constitutionally protected fundamental
> right to labor.   The fundamental right to labor in an occupation of common right is
> not a Government granted privilege nor a revenue taxable activity, and therefore
> "Exempt."

Motion for Surreply ¶ A, at 6.   The Hopkins assert that, although they have stated their position

"in every conceivable way, what has been most conspicuous is how the Government consistently

avoids the acknowledgement of the existence of a fundamental right to work as if it is the 3rd rail."

Motion for Surreply ¶ A, at 6.

The Hopkins assert that the fundamental right to labor existed before the Sixteenth

Amendment.   See Motion for Surreply ¶ A, at 7 (citing Butchers' Union Co. v. Crescent City Co.,

111 U.S. 746 (1884); Yick Wo v. Hopkins, 118 U.S. 356, 370 (1886)).   The Hopkins contend that

the Supreme Court affirmed the fundamental right to work after enactment of the Sixteenth

Amendment in Smith v. Texas, 233 U.S. 630, 641 (1914), and Truax v. Raich, 239 U.S. 33 (1915).

See Motion for Surreply ¶ A, at 9-10.   The Hopkins argue that "neither the Constitution nor the

16th Amendment can abrogate any of the fundamental rights that include the right to work."

Motion for Surreply ¶ A, at 10 ( citing Miranda v. Arizona, 384 U.S. 436, 491 (1966)("Where

rights secured by the Constitution are invoked, there can be no rule making or legislation which

would abrogate them.")). The Hopkins argue that the Sixteenth Amendment conferred upon

Congress no new power of taxation, but relieved all income tax from the apportionment

requirement.   See Motion for Surreply ¶ A, at 11 (citing Brashaber v. Union Pac. R.R. Co., 240

U.S. at 1; Stanton v. Baltic Mining Co., 240 U.S. 103 (1916)).   The Hopkins assert:

The Government (state) may not impose a fee or charge in order to enjoy any fundamental right.   It is for this reason that compensation for labor is <u>exempt</u>, not the reason stated by [the United States] and which he tries over and over again to ascribe to us; that wages and compensation received from personal services are an equal exchange.   I believe this to be true but don't rest my claim of "<u>exemption</u>" upon this fact, but instead upon the fundamental right issue.

Motion for Surreply ¶ A, at 11 (emphasis in original).

The Hopkins point out that the IRS manual directs IRS employees to follow Supreme Court decisions and that they are given the same weight as the IRC.   <u>See</u> Motion for Surreply at 12.   The Hopkins assert: "We believe the IRC must accommodate Supreme Court decisions in the area of taxation for to violate these would render the Code unconstitutional which it is not; so an area of accommodation exists -- 'except as provided in this subtitle.'"   Motion for Surreply ¶ A, at 12-13.   The Hopkins contend that, to understand the IRC, one must begin with the code as enacted in 1939, which, even then, used an all-inclusive definition of income for "purposes of comprehensiveness and efficiency," but still provided for " 'exemptions and exclusions' from gross income . . . ."   Motion for Surreply ¶ A, at 13-14.   The Hopkins assert that these exemptions and exclusions continue to exist in 26 U.S.C. § 61(a), where, in the definition of what is gross income, the IRS states "except otherwise provided in this subtitle."   Motion for Surreply ¶ A, at 14 (quoting 26 U.S.C. § 61(a)).   The Hopkins contend that this language has existed in the tax code from the beginning to allow for the fundamental right to work to be exempt from taxation, but has been lost through the United States' "disparaging ancient Court decisions and Regulations, and instead [] provid[ing] Supreme Court cases overturning decisions we had relied upon . . . ."   Motion for Surreply ¶ A, at 14-15.

The Hopkins state that the United States "rightly makes the point that any income from whatever source is presumed to be income under 26 U.S.C. § 61 <u>unless</u> the taxpayer can prove that

-38-

it is specifically exempt or excluded."   Motion for Surreply at 16 (emphasis in original).   They

assert, however, "this we have done by the aforementioned discussion of fundamental rights and

compensation through labor, and through [the 1939 tax code]; the entire compensation arising

from an hourly rate received while working as an Emergency Room Physician."   Motion for

Surreply ¶ A, at 16.   The Hopkins then point out that, rather than replying to the Hopkins'

assertion of their income being exempt because they are exercising the fundamental right to work,

the United States refers the Court to a litany of cases that merely dismiss taxpayer's lawsuits as tax

defier arguments.   See Motion for Surreply ¶ A, at 17.   The Hopkins show that the facts

underlying the cases cited by the United States are easily distinguishable, as none of the cited cases

discusses the argument that labor from working at an hourly rate is exempt as exercising a

fundamental right.   See Motion for Surreply ¶ A, at 17-18. The Hopkins contend, rather, that the

United States' taxation of their fundamental right to work is more closely analogous to the

Supreme Court's finding unconstitutional taxing the exercise of fundamental rights in Murdock v.

Pennsylvania, 319 U.S. 105 (1943), Follett v. McCormick, 321 U.S. 573 (1944), and Grosjean v.

Am. Press Co., 297 U.S. 233 (1936).   See Motion for Surreply ¶ A, at 19-21.

     The Hopkins assert that this fundamental right to work being exempt from taxation "is the

paramount issue that the Defendants were prohibited from developing in the criminal trial and

which the jury was not instructed to consider; the issue of exempt income that arises out of the

exercise of a Fundamental Right."   Motion for Surreply ¶ A, at 21-22.   This exemption, the

Hopkins contend, is the reason why res judicata does not apply to the United States' Motion for

Summary Judgment.   See Motion for Surreply ¶ A, at 23.   In regard to res judicata's finality

requirement, the Hopkins note that the "Court appointed appeals attorney . . . vehemently opposed

raising any Constitutional issues on appeals for fear of being sanctioned and informed us that those

issues were better left to [another] pleading." Motion for Surreply ¶ A, at 23-24.

The Hopkins then state:

The remainder of the reply becomes [moot] due to Constitutional issues . . . if the Court accepts and affirms that the Hopkins have a fundamental right to work and that compensation for labor when exercising that right is exempt, and that the claim of exemption is not only valid but integrated within the code.   The Hopkins have ample evidence of this long held belief as far back as April 15, 1997 which would encompass all years in dispute, and upon which they stringently adhered and acted upon in a good faith belief.

Motion for Surreply ¶ B, at 24.   They reiterate their argument that the Form 1040 that they filed for 1996 indicating that they had zero income is a valid return under the law.   See Motion for Surreply ¶ B, at 24-25.   The Hopkins distinguish Bachmann v. C.I.R., 283 F. App'x 636 (10th Cir. 2008), and United States v. Rickman, to which the United States cites to support that the tax returns were invalid, by noting that, whereas the taxpayers in those cases did not offer valid justification for submitting a zero return, the Hopkins' argument that their income is exempt from taxation is a valid justification.   See Motion for Surreply ¶ B, at 25-26.   In paragraph C, the Hopkins contend that the letter they filed with the Court that accompanied their Form 1040 for tax year 1996 shows that they filed a Form 1040 for that year, regardless whether the United States contends that they did not.   See Motion for Surreply ¶ C, at 28-29.   The Hopkins also assert that they have not avoided liability, because "the Hopkins had only 'Exempt' income and could therefore have had no liability to avoid."   Motion for Surreply ¶ D, at 29-30.   The Hopkins note that the meetings to which the United States refers as tax defier meetings discussed tax issues, but also discussed the Declaration of Independence and the Constitution more broadly, encouraging people to research and confirm what was discussed to become more knowledgeable about the Constitution and the government overall. See Motion for Surreply ¶ E, at 30.   The Hopkins state:

In the issue of $130,000 seized, the Hopkins are satisfied that the $130,000 was

-40-

credited to TY 1996 although the Hopkins still hold to the belief that there should have been zero income as they attested to under penalty of perjury.   Likewise, the $32,383 which was reported on the TY 1996 - 1040 Form which the united States claims as "invalid return;" the Hopkins are satisfied with its accounting also under the same qualification . . . .

Motion for Surreply ¶ F, at 31.

The Hopkins contend that taxing the Hopkins separately, each on one-hundred percent of their individual income and then again on fifty percent of the spouse's income, then converting that sum to judgment, "is a license to print money out of thin air and further obligate the Hopkins for a tax burden that should have never existed in the first place."   Motion for Surreply ¶ G, at 32-33.   The Hopkins take issue with the United States' contention that they had a full and fair hearing on the merits of their constitutional argument at their criminal trial.   See Motion for Surreply ¶ H, at 33.   The Hopkins note that they still believe the issues are not ripe for summary judgment, as they have not completed discovery and are awaiting the Court's ruling on their discovery motions.   See Motion for Surreply ¶ I, at 34.   The Hopkins concede that the issues regarding whether witnesses will be able to testify at trial should wait until the appropriate time as trial nears.   See Motion for Surreply ¶ J, at 35.   The Hopkins conclude by reiterating their position that "the government has no rebuttal to the simple claim or even an acknowledgment of a citizen's Constitutionally guaranteed fundamental right to work or whether the Government may tax that right or any right."   See Motion for Surreply ¶ K, at 35-37.

At the Court's hearing on the Motion for Summary Judgment, Bayview Loan asked the Court to be excused from further pretrial proceedings, because it does not need to be involved in the case until after the foreclosure sale takes place and distribution of the proceeds is made.   See Tr. at 3:2-22 (Court, Jaramillo).   All parties still remaining in the case agreed to Bayview Loan's request to be excused from further pretrial proceedings, and the Court granted Bayview Loan's

-41-

request, excused them from the hearing, and will excuse them from further pretrial proceedings. See Tr. at 5:23-6:15 (Court, Jaramillo, Lena, M. Hopkins, S. Hopkins).   Before taking up the motion, the Court also granted the Hopkins' Motion for Telephonic Appearance Re: Motion Hearing on January 3, 2013, filed December 21, 2012 (Doc. 141), to which the United States did not object.   See Tr. at 7:7-21 (Court, Lena).   The Court then also granted the Hopkins' Motion for Leave of Court to Reply to Plaintiffs' [sic] Reply to Hopkins' Response to Motion for Summary Judgment, filed September 4, 2012 (Doc. 106), and noted that it took the United States' response to the Hopkins' motion -- the United States' Response to Hopkins' Motion for Leave to File Sur-Reply, filed September 24, 2012 (Doc. 110) -- into account in its decision to grant the motion.   See Tr. at 9:1-22, 11:12-22 (Court, M. Hopkins, S. Hopkins, Lena).

The United States stated:

> [T]he Constitution of the United States at Article I Section 8 allows Congress to lay and collect taxes and put simply, the Supreme Court, when it was looking at the Affordable Care Act recently [had] this to say . . . : "put simply, Congress may tax and spend.   This grant gives the Federal Government considerable influence even in areas where it cannot directly regulate.   The Government may enact a tax on an activity that it cannot authorize, forbid or otherwise control."

Tr. at 13:18-14:4 (Lena)(quoting Nat'l Fed'n of Indep. Bus. v. Sebelius, 132 S. Ct. 2566, 2579 (2012)).   The United States noted that the particular argument that a person has a basis in his or her labor equal to the fair market value of the compensation received -- and the many variations of that argument -- in addition to having been rejected by multiple Circuit courts and district courts, "have officially been identified . . . as legally frivolous federal tax return positions for the purposes of the $5,000.00 frivolous tax return policy . . . [found at] 26 U.S.C. section 6702(A)."   Tr. at 14:8-20 (Lena).   The United States pointed out that, while the United States Constitution explicitly allows Congress to impose duties and taxes, the Constitution provides no exemptions or

exceptions.   See Tr. at 14:24-15:3 (Lena).

The United States referred the Court to federal cases from around the country that have rejected the argument that compensation from labor is exempt from wages.   See Tr. at 15:6-21:24 (Lena)(citing Funk v. C.I.R., 687 F.2d 264 (8th Cir. 1982); Lonsdale v. C.I.R., 661 F.2d 71 (5th Cir. 1981); Lonsdale v. United States, 919 F.2d 1440 (10th Cir. 1990); United States v. Lawson, 670 F.2d 923 (10th Cir. 1982); United States v. Connor, 898 F.2d 942 (3d Cir. 1990); United States v. Francisco, 614 F.2d 617 (8th Cir. 1980); Broughton v. United States, 632 F.2d 706 (8th Cir. 1980); United States v. Russell, 585 F.2d 368 (8th Cir. 1978); Perkins v. C.I.R., 746 F.2d 1187 (6th Cir. 1984)).   The United States pointed out that the United States Court of Appeals for the Fifth Circuit in Lonsdale v. C.I.R., and then subsequently the Tenth Circuit, in Lonsdale v. United States, rejected the same arguments from the plaintiff that the Hopkins are asserting in this case. See Tr. at 15:21-17:10 (Lena). The United States noted that in Funk v. C.I.R., where the taxpayers filed zero income tax returns, as the Hopkins did here, the United States Court of Appeals for the Eighth Circuit found that the tax returns were invalid and that the taxpayers' argument that their income from their labor was not taxable was without merit.   See Tr. at 18:14-19:10 (Lena).   The United States referred the Court to United States v. Lawson, wherein the Tenth Circuit held: "[T]he defendant[']s wages for personal services are income under the Internal Revenue Code. The Congress has specifically provided that gross income means all income from whatever source derived, including, but not limited to, the following items. Number one, compensation for services, including fees, commissions, and similar items."   Tr. at 19:20-20:1 (Lena)(citing United States v. Lawson, 670 F.2d at 925).   The United States noted that, in United States v. Connor, the United States Court of Appeals for the Third Circuit stated that every court that has considered the issue has "unequivocally rejected the argument that wages are not income."   Tr. at 20:13-18

-43-

(Lena)(citing <u>United States v. Connor</u>, 898 F.2d at 943-44). The United States pointed out that in <u>United States v. Russell</u> the Eighth Circuit rejected the taxpayer's argument that it was unconstitutional to tax his common-law right to work.   <u>See</u> Tr. at 21:8-16 (Lena).

The Court stated that it believes the Hopkins' argument to be that there is an inherent conflict in Supreme Court precedent, with a handful of older cases saying that there is a protected, fundamental right to work, and the power to tax such a right in light of Justice Marshall's statement, in <u>McCulloch v. Maryland</u>, 17 U.S. 316 (1819), that a right to tax is a right to destroy. The Court inquired of the United States whether any court has analyzed the issue whether taxing income is constitutional in light of these apparently conflicting constitutional propositions.   <u>See</u> Tr. at 21:25-23 (Court).   The United States responded that, in its experience, the courts have looked to the Constitution providing Congress the power to tax and thus the power to enact statutes to carry out that power, and to whether 26 U.S.C. §§ 61 and 62, providing for taxation of compensation for labor and services, is within Congress' power.   <u>See</u> Tr. at 22:16-23:16 (Lena). The United States stated that it could not, however, provide the Court with a case on point at that time.   <u>See</u> Tr. at 23:19-25 (Lena).

The Court moved to the United States' argument that the Hopkins are precluded from asserting their arguments against the United States in this civil trial based on the res judicata doctrine, and asked the United States whether the issues in the case fall under res judicata or collateral estoppel.   <u>See</u> Tr. at 24:20-25:2 (Court).   The United States stated that it is asserting that, because it had to prove as an element of criminal tax evasion against the Hopkins that they owed tax, and a certain amount, the Hopkins are precluded from arguing contrary to the jury's findings in their criminal case.   <u>See</u> Tr. at 25:2-19 (Lena).   The Court asked whether the United States contends that all issues material for summary judgment are precluded by res judicata or

-44-

collateral estoppel, or whether it concedes that there are some issues as to which the United States must present undisputed evidence before the Court can grant summary judgment.  See Tr. at 25:20-25 (Court).   The United States responded that the Court must determine the actual amount owing, because, while the jury determined that the Hopkins owed a "substantial amount," the jury instructions did not require the jury to find the actual amount owing.  Tr. at 26:1-27:11 (Court, Lena).   The United States stated that the exhibits it submitted as attachments with its motion, in light of the Hopkins' responses, show that there is no genuine issue of material fact as to the amounts which the Hopkins owe that the United States seeks in the case.  See Tr. at 27:12-20 (Lena).

The Court asked, in regard to finding that Shalom Enterprises and House of Royale were the Hopkins' nominees or alter-egos, whether the United States agreed that the criminal trial established that the Hopkins used nominees as part of the conspiracy, but not Shalom Enterprises and House of Royale particularly.  See Tr. at 27:21-28:10 (Court).   The United States responded that the Court is correct that the jury found only that the Hopkins used two entities as nominees, but pointed out that the Court has already entered default judgments against both Shalom Enterprises and House of Royale as defendants in this civil case.  See Tr. at 28:18-29:20 (Court, Lena).   The United States asserted that it is thus "on firm ground, particularly with this additional summary judgment evidence . . . [to prove] both of those specific entities were specifically used as nominees to gain title in the property and hold property to conceal income and assets from the Government by the Hopkins."  Tr. at 29:21-30:5 (Lena).   The United States noted that the Hopkins' criminal conviction is on appeal at the Tenth Circuit, that the Hopkins do not have the ability to mount an impermissible collateral attack on their criminal conviction, and that the Court also should not entertain an argument contrary to anything that was proved beyond a reasonable

doubt in their criminal trial.   <u>See</u> Tr. at 30:14-31:11 (Lena).   In regards to the $130,000.00 tax

lien, the United States pointed out that the Honorable William P. Johnson, United States District

Judge for the District of New Mexico, stated in a decision from this district court that the federal

tax liens arose against M. Hopkins on December 25, 2005, when tax assessments were made for

tax years 1996 and 1997, and that the jury convicted M. Hopkins guilty for those tax years.   <u>See</u>

Tr. at 31:16-32:4 (Lena).   In response to the Court's inquiry whether the United States had

anything further to add on the motion, the United States referred the Court to the portions of the

record that supported its factual assertions as to the amounts that the Hopkins owe.   The United

States asked the Court to pay particular attention to the IRS' records of its investigation into the

Hopkins' earnings, which it has   submitted with the Motion for Summary Judgment, the

declaration of Special Agent Jennifer and her exhibits, and the declaration of IRS agent Sandra

Villareal.   <u>See</u> Tr. at 32:16-34:12 (Lena).

        The Court turned to the Hopkins for their response to the United States' Motion for

Summary Judgment, and asked the Hopkins whether they were disputing the United States' factual

assertions, including the amount of money that they owe or the propriety of the United States'

liens, or whether they are seeking to make a bigger argument: that "there shouldn't be any

assessment at all for wages and income."   Tr. at 37:15-38:2 (Court).   M. Hopkins responded that

the Court is correct, and that they are making a bigger constitutional argument, a "legal argument

that [the United States] cannot tax constitutionally [the] right to work, . . . that there's no gain,

there's no profit, because [one is] making an equal exchange of [] work for a certain amount of

income . . . ." Tr. at 38:3-11 (M. Hopkins, Court).   M. Hopkins stated that his argument is that,

under <u>McCulloch v. Maryland</u>, there are certain subjects over which the power of the state to tax

cannot extend and that those subjects are exempt from taxation.   This proposition, he asserted,

"may almost be pronounced self-evident."   Tr. at 38:21-39:3 (M. Hopkins). M. Hopkins conceded

that "if we are not exempt everything Mr. Lena [attorney for the United States] has said is correct."

Tr. at 39:4-6 (M. Hopkins).   The Court responded whether it understood M. Hopkins correctly

that the issue the Court needs to decide to enter summary judgment is whether <u>McCulloch v.</u>

<u>Maryland</u> makes unconstitutional the IRS' position that wages are taxable income.   <u>See</u> Tr. at

39:7-12 (Court).   M. Hopkins responded that "I'm claiming that [the United States] ha[s]

limitations and [] can tax [only] what [it] ha[s] authority over," and that the United States does not

have the authority to tax the "fundamental right to work."   Tr. at 39:13-24 (M. Hopkins).   The

Hopkins asserted that, "just because the 16 Amendment came along and said Congress shall have

the power to lay and collect taxes on income from whatever source derived does not take away any

fundamental rights . . . ."   Tr. at 39:25-40:7 (M. Hopkins).   The Hopkins stated that the IRC is

written so that it taxes "anything and everything out there . . . . but then there are exemptions that

are carved out."   Tr. at 40:8-11 (M. Hopkins).   The Hopkins asserted that, although "Congress

may not have specifically mentioned a fundamental right to work" as being exempted under the

IRC, because the Ninth Amendment to the Constitution "states even if those items are not

specifically mentioned they still exist, and one of those items, the most valuable item you have is

your property, your ability to contract, so you can provide for your family."   Tr. at 41:7-12 (M.

Hopkins).   They further stated that this exemption under the Ninth Amendment for compensation

for labor as property was a right exempt from taxation before the Sixteenth Amendment, and "we

still have it. Everybody in the world does."   Tr. at 41:15-18 (M. Hopkins).   The Hopkins

asserted:

> [W]e were never served any document by the secretary requiring us nor by the
> district director requiring us to keep records, written statements, or make returns.
> We didn't file 1040 forms because we felt that the income that we had was exempt

and we had filed affidavits to that effect multiple times and never got any response. And there is no specific regulation that makes us liable.

Tr. at 42:18-24 (M. Hopkins).

The Hopkins noted that the exemptions mentioned in 26 U.S.C. § 61 and in the Treasury Regulations, including 26 C.F.R. § 1.861, exempt income and assets from other sources, and "so the idea of an exemption and exempt income and exempt assets are still in the code over the years . . . . They can't do away with a fundamental right." Tr. at 42:25-43:18 (M. Hopkins). The gravamen of their argument, they asserted, is that, because the IRS is an agency that works under and pursuant to the IRC's statutory scheme, the IRS is invalid, and the assessments and determination of liability that the IRS made as to the Hopkins are also invalid. See Tr. at 43:19-44:8 (M. Hopkins). The Court responded:

> What I'm hearing is that we really don't need a trial on any issue, there's no genuine issue of material fact, but there's a legal issue that you're raising that you want the court to determine. Am I understanding your position correctly . . . . I'm not hearing there's really a dispute about the facts. What there's a dispute about is the validity of the assessment from a <u>legal</u> standpoint. Am I -- Is that a correct assessment of your argument?

Tr. at 44:9-19 (Court)(emphasis added). The Hopkins responded: "That's correct, Your Honor." Tr. at 44:20 (M. Hopkins). They asserted that the civil proceeding is therefore of a very different nature from the criminal proceeding against them. The Hopkins asserted that, while the proceedings involve the same parties, the United States only had to prove that a substantial amount was owing in the criminal trial; whereas, in the civil case, the Court may analyze whether the assessments made which caused the Hopkins to owe a substantial amount are constitutional. See Tr. at 44:20-45:2 (M. Hopkins). The Hopkins pointed out that, with regard to the "laundry list of cases" to which the United States refers in its argument, those cases have no application to the Hopkins' civil case unless the Court determines that, under the Constitution, the Hopkins are liable

-48-

for tax on M. Hopkins' income.   See Tr. At 45:19-46:4 (M. Hopkins).   In response to the Court's

inquiry, the Hopkins agreed that foundational to any such liability is the Supreme Court cases,

including McCulloch v. Maryland, which "broadly lay[] out that the Government state can't

impose a tax on any fundamental right."   Tr. at 46:9-17 (M. Hopkins).   The Hopkins concluded

that as "the summary judgment goes, I think I've laid the case out throughout all of our filings and

. . . the road splits [whether] the Government indeed does have total authority over what they

[claim to] have authority over, but if [the fundamental right to work is exempt,] they definitely

don't."   Tr. at 46:18-22 (M. Hopkins).   In response to the Court's question whether there was

anything that the M. Hopkins had to add, he responded that he did not, and that "I do agree that . .

. this is [] more of a legal issue. I don't see a need for a jury trial . . . ."   Tr. at 48:3-5 (M. Hopkins).

S. Hopkins added that one "has to look at what the definition of income is, and income is clearly

defined under Eisner v. Macomber[, 252 U.S. 189 (1920)] and [C.I.R. v. ]Glenshaw Glass[, 348

U.S. 426 (1955)].   It is not everything that comes in."   Tr. at 48:9-16 (S. Hopkins).   She asserted

that "just because it is -- you can tax income from whatever source derived, the source derived isn't

the issue.   The issue is [], is it taxable income?"   Tr. at 48:14-16 (S. Hopkins).

    The United States referred the Court to its United States' Response to Untimely Hopkins'

Interrogatories 7-19, see Certificate of Service of United States' Response to Untimely Hopkins'

Interrogatories 7-19, filed December 28, 2012 (Doc. 144), at page six, as an example of its

contention that multiple courts have rejected the Hopkins' argument that, for tax purposes, there is

a basis of zero in a person's labor.   See Tr. at 51:4-22 (Lena).   The United States asserted that

"the taxpayer can only have a zero basis amount in his or her own labor because the [real] personal

living expenses incurred to generate the labor is both non-capitalizable[,] and under 26 U.S.C.

section 262[,] not deductible."   Tr. at 52:4-8 (Lena).   The United States contended that, while a

person may have the fundamental right to work, once the person receives income for exercising

that right to work, the IRS, pursuant to Congressional statutes, has the ability to tax that income.

See Tr. at 56:23-58 (Lena).   In response to the Court's question whether the United States can

point the Court to a case that provides the proposition that once a person is paid for the right to

work, the United States then has the ability to tax that payment, the United States referred the

Court, once again, to United States v. Russell, and to the Circuit Court opinions that have looked to

the Constitution, and held that "Congress has the ability to define compensation from services as

income, [] taxable [under] sections 62, 63, [and section 61] of the Internal Revenue [Code]."   Tr.

at 57:21-58:1 (Lena).   The United States concluded by stating:

> [T]he United States is merely asking for the ability to have the court grant summary
> judgment in its favor and [] ask the Court to reduce the Assessments to judgment
> for the tax years 96, 97, 99, 2000, and 2001, and [] ask that the court grant the
> United States' summary judgments such that it can foreclose its federal tax liens in
> all property and rights to property owned by the Hopkins.

Tr. at 61:20-62:2 (Lena).

The Court stated that it would take the Motion for Summary Judgment under advisement,

that it looks like the facts are largely undisputed, and that the issue appears to be legal rather than

factual.   See Tr. at 62:4-16 (Court).   The Hopkins stated:

> In our response back -- it was number document 96 and it's our response to that
> motion for summary judgment, I would like you when you are considering this,
> please look at pages 9 and 10 and 11.   We have been painted with this broad brush
> of having come down out the side of what [we] were [truly] saying in all of their
> separate arguments, and in that you will see what we believe -- [] [] what our beliefs
> are as opposed to what the U.S. Attorney is . . . saying [] we believe.   I really
> believe that [it] could [] shed some light on us and the [stance] that we are taking.
> We do not believe those 11 stances that the U.S. Attorney keeps telling . . . telling
> you [that we believe], sir.

Tr. at 62:20-63:7 (S. Hopkins).   The Court asked the United States whether, if the Court granted

the summary judgment, the United States would at that point need a final judgment entered in the

-50-

matter or whether the United States would need something further from the Court.   See Tr. at 67:12-16 (Court).   The United States responded that the Summary Judgment would allow the United States to go forward with foreclosure and the foreclosure sale, but Bayview Loan and the United States would then have to file a stipulation with the Court to memorialize their agreement as to the proceeds. See Tr. at 68:4-14 (Court, Lena).

## LAW REGARDING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   The movant bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case." Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)(internal quotation marks omitted).   See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).   Once the movant meets this burden, rule 56 requires the non-moving party to designate specific facts showing that there is a genuine issue for trial.   See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."   Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).   See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (internal quotation marks omitted)).   Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . . citing to particular parts of materials in the

-51-

record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."   Fed. R. Civ. P. 56(c)(1).   It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his [or her] pleadings."   Anderson v. Liberty Lobby, Inc., 477 U.S. at 256.   See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, 'once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.'" (citation omitted)).   Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation."   Colony Nat'l Ins. Co. v. Omer, No. 07-2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(citing Fed. R. Civ. P. 56(e); Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)).   "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'"   Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250.   A mere "scintilla" of evidence will not avoid summary judgment.   Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248).   Rather, there must be sufficient evidence on which the factfinder could reasonably find for the nonmoving party.   See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251

(quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v.

Beatrice Co., 11 F.3d at 1539.   "[T]here is no evidence for trial unless there is sufficient evidence

favoring the nonmoving party for a jury to return a verdict for that party.   If the evidence is merely

colorable . . . or is not significantly probative, . . . summary judgment may be granted."   Anderson

v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted).   Where a rational trier of fact,

considering the record as a whole, could not find for the non-moving party, there is no genuine

issue for trial.   See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain

principles.   First, the court's role is not to weigh the evidence, but to assess the threshold issue

whether a genuine issue exists as to material facts requiring a trial.   See Anderson v. Liberty

Lobby, Inc., 477 U.S. at 249.   Second, the ultimate standard of proof is relevant for purposes of

ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court

must "bear in mind the actual quantum and quality of proof necessary to support liability."

Anderson v. Liberty Lobby, Inc., 477 U.S. at 254.   Third, the court must resolve all reasonable

inferences and doubts in favor of the non-moving party, and construe all evidence in the light most

favorable to the non-moving party.   See Hunt v. Cromartie, 526 U.S. at 550-55; Anderson v.

Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all

justifiable inferences are to be drawn in his favor.").   Fourth, the court cannot decide any issues of

credibility.   See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

## THE RIGHT TO ENGAGE IN A COMMON OCCUPATION OR PROFESSION

"It is undoubtedly the right of every citizen of the United States to follow any lawful

calling, business, or profession he may choose . . . . This right may in many respects be considered

as a distinguishing feature of our republican institutions."   Dent v. West Virginia, 129 U.S. 114,

121 (1889).   The Due Process Clause of the Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law . . . ."   U.S. Const. amend. IV. The Supreme Court has held that the substantive rights protected by the Fifth Amendment Due Process Clause are co-extensive with those protected under the Fourteenth Amendment.   See Hibben v. Smith, 191 U.S. 310, 325 (1903)("The 14th Amendment, it has been held, legitimately operates to extend to the citizens and residents of the states the same protection against arbitrary state legislation affecting life, liberty, and property as is offered by the 5th Amendment against similar legislation by Congress").   The Supreme Court has noted that, included under the "the liberty [] guaranteed" under the Fourteenth Amendment's Due Process Clause is the right "to engage in any of the common occupations of life . . . ."   Meyer v. Nebraska, 262 U.S. 390, 399 (1923).   Cf. Schware v. Bd. of Bar Exam'rs of N.M., 353 U.S. 232, 238-39 (1957)("A State cannot exclude a person from the practice of law or from any other occupation in a manner or for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment.").   The Supreme Court has stated:

> The right to follow any of the common occupations of life is an inalienable right, it was formulated as such under the phrase 'pursuit of happiness' in the declaration of independence, which commenced with the fundamental proposition that 'all men are created equal; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness.' This right is a large ingredient in the civil liberty of the citizen. To deny it to all but a few favored individuals, by investing the latter with a monopoly, is to invade one of the fundamental privileges of the citizen, contrary not only to common right, but, as I think, to the express words of the constitution. It is what no legislature has a right to do; and no contract to that end can be binding on subsequent legislatures.

Butchers' Union Slaughter-House & Live-Stock Landing Co. v. Crescent City Live-Stock Landing & Slaughter-House Co., 111 U.S. 746, 762 (1884)(emphasis in original)("Butchers' Union Co.").

The fundamental right to engage in the common occupations of life is not, however, without its limitations.   As early as 1889, in Dent v. West Virginia, the Supreme Court recognized that the right of every citizen "to follow any lawful calling, business, or profession he may choose," a right that may be considered fundamental to "our republican institutions," is not exempt from regulation: "It is undoubtedly the right of every citizen of the United States to follow any lawful calling, business, or profession he may choose, subject only to such restrictions as are imposed upon all persons of like age, sex, and condition." 129 U.S at 121 (emphasis added).   In Butchers' Union Co., in stating that "[t]he right to follow any of the common occupations of life is an inalienable right," the Supreme Court, in the next paragraph, recognized that this right is not absolute, but subject to regulation: "[T]he proposition, (which I deem a fundamental one,) that the ordinary pursuits of life, forming the large mass of industrial avocations, are and ought to be free and open to all, subject only to such general regulations, applying equally to all, as the general good may demand." Butchers' Union Co., 111 U.S. at 763 (emphasis added).   In Lochner v. New York, 198 U.S. 45, 53 (1905), the Supreme Court, in striking down a statute restricting the amount of hours bakers could legally work, recognized that the fundamental right to purchase and sell labor is subject to the government's reasonable exercise of its powers, including the government's power to provide for the general welfare:

> The right to purchase or to sell labor is part of the liberty protected by [the Fourteenth] amendment, unless there are circumstances which exclude the right. There are, however, certain powers, existing in the sovereignty of each state in the Union . . . termed police powers, the exact description and limitation of which have not been attempted by the courts. Those powers, broadly stated, and without, at present, any attempt at a more specific limitation, relate to the safety, health, morals, and general welfare of the public. Both property and liberty are held on such reasonable conditions as may be imposed by the governing power of the state in the exercise of those powers, and with such conditions the 14th Amendment was not designed to interfere.

Lochner v. New York, 198 U.S. at 53 (emphasis added)(citing Mugler v. Kansas, 123 U.S. 623

(1887); In re Kemmler, 136 U.S. 436 (1890); Crowley v. Christensen, 137 U.S. 86 (1890); Ex

parte Converse, 137 U.S. 624 (1891)).   The Supreme Court in Meyer v. Nebraska, in recognizing

that the Due Process Clause protects the right to engage in one's chosen occupation, continued that

"this liberty [interest] may not be interfered with, under the guise of protecting the public interest,

by legislative action which is arbitrary or without reasonable relation to some purpose within the

competency of the state to effect."   262 U.S. at 399-400.

## CONGRESS' CONSTITUTIONAL POWER TO TAX INCOME

Article I, section 8 of the United States Constitution gives Congress the "Power To lay and

collect Taxes . . . ."   U.S. Const. art. I, § 8.   In the context of Article I, section 8, pre-Sixteenth

Amendment, the Supreme Court noted:

> The great object of the Constitution was, to give Congress a power to lay
> taxes, adequate to the exigencies of government; but they were to observe two rules
> in imposing them, namely, the rule of uniformity, when they laid duties, imposts, or
> excises; and the rule of apportionment, according to the census, when they laid any
> direct tax.

Hylton v. United States, 3 U.S. 171, 173 (1796).   The Supreme Court recognized at an early time

the expansive power given to Congress in the Taxing and Spend Clause:

> The power of Congress to tax is a very extensive power. It is given in the
> Constitution, with only one exception and only two qualifications. Congress cannot
> tax exports, and it must impose direct taxes by the rule of apportionment, and
> indirect taxes by the rule of uniformity. Thus limited, and thus only, it reaches
> every subject, and may be exercised at discretion.

License Tax Cases, 72 U.S. 462, 471 (1866).   Accord Pac. Ins. Co. v. Soule, 74 U.S. 433, 445

(1868)("The only limitations imposed are: That direct taxes, including the capitation tax,[8] shall be

---

[8]A capitation tax -- also known as a per capita tax, polltax, or a head tax -- is "[a] fixed tax
levied on each person within a jurisdiction," regardless of income or worth.   Black's Law

apportioned; that duties, imposts, and excises shall be uniform; and that no duties shall be imposed upon articles exported from any State. With these exceptions, the exercise of the power is, in all respects, unfettered."); Pollock v. Farmers' Loan & Trust Co., 157 U.S. 429, 557 (1895) ("Congress cannot tax exports, and it must impose direct taxes by the rule of apportionment, and indirect taxes by the rule of uniformity. Thus limited, and thus only, it reaches every subject, and may be exercised at discretion."), overruled on other grounds by S. Carolina v. Baker, 485 U.S. 505 (1988), and opinion vacated on reargument, 158 U.S. 601 (1895).  Likewise, in Springer v. United States, the Supreme Court noted: "The Constitution gives to Congress the power 'to lay and collect taxes, duties, imposts, and excises.' Except as to exports, no limit to the exercise of the power is prescribed." 102 U.S. at 593 (quoting U.S. Const. art. I, § 8).  Thus, at the time of its ratification, the Constitution granted Congress the power to lay and collect taxes limited only by the prohibition of taxing exports, the requirement that indirect taxes be uniform, and the requirement that direct taxes be apportioned.

The Supreme Court thus reasoned that the power to restrain Congress' exercise of the taxing power lies with the electorate and not with the judicial branch: "If the [tax] laws [] in question involved any wrong or unnecessary harshness, it was for Congress, or the people who make congresses, to see that the evil was corrected. The remedy does not lie with the judicial branch of the government." 102 U.S. at 594.  The Supreme Court's recognition of the breadth of Congress' tax power has not since receded: "Put simply, Congress may tax and spend. This grant gives the Federal Government considerable influence even in areas where it cannot directly regulate. The Federal Government may enact a tax on an activity that it cannot authorize, forbid, or otherwise control."   Nat'l Fed'n of Indep. Bus. v. Sebelius, 132 S. Ct. 2566, 2579

Dictionary 1596 (9th ed. 2009).

(2012)(upholding the Patient Protection and Affordable Care Act as a constitutional exercise of Congress' tax power). There was, however, from the Constitution's ratification up to the Sixteenth Amendment's ratification, a debate whether a tax on income was a direct or indirect tax, because of the requirement -- until the Sixteenth Amendment's ratification -- that a direct tax had to be proportioned among the states.

    1.       <u>Income Taxation before the Sixteenth Amendment</u>.

The Supreme Court in <u>Hylton v. United States</u> held that an annual tax on carriages used "for the conveyance of persons," 3 U.S. at 171, was an indirect tax, reasoning that "the direct taxes contemplated by the Constitution are only two, . . . a capitation, or poll tax . . . ; and a tax on LAND," 3 U.S. at 175.   In <u>Springer v. United States</u>, 102 U.S. 586 (1880), the Supreme Court upheld the constitutionality of an annual "duty . . . assessed . . . upon the gains, profits, and income," 102 U.S. at 593, as an indirect direct tax, reasoning that "[i]t is not a tax on the 'whole . . . personal estate' of the individual, but only on his income, gains, and profits during a year, which may have been but a small part of his personal estate, and in most cases would have been so," 102 U.S. at 598.   In <u>Pollock v. Farmers' Loan & Trust Co.</u>, 158 U.S. 601 (1895), however, the Supreme Court extended the concept of a tax on land, or real estate, being a direct tax to hold that the tax on income derived from property, whether real or personal, is also a direct tax.   <u>See</u> 158 U.S. at 637 ("[T]axes on real estate being indisputably direct taxes, taxes on the rents or income of real estate are equally direct taxes. [] We are of opinion that taxes on personal property, or on the income of personal property, are likewise direct taxes.").   Thus, although there was debate whether income taxation was direct or indirect, there was never a doubt whether a tax imposed on income is constitutional.   <u>See Pollock v. Farmers' Loan & Trust Co.</u>, 158 U.S. at 635 ("We . . . have not commented on so much of [the income tax] as bears on gains or profits from business,

privileges, or employments, in view of the instances in which taxation on business, privileges, or employments has assumed the guise of an excise tax and been sustained as such.");   Brushaber v. Union Pac. R.R. Co., 240 U.S. 1, 16 (1916)(noting that, in holding that taxation of income from property was a direct tax, the Supreme Court in Pollock v. Farmers' Loan & Trust Co. "enforced a regulation as to the mode of exercising power under particular circumstances, it did not in any way dispute the all-embracing taxing authority possessed by Congress, including necessarily therein the power to impose income taxes . . .").

### 2.      Taxation of Income after the Sixteenth Amendment.

The Sixteenth Amendment provides: "The Congress shall have power to lay and collect taxes on incomes, from whatever source derived, without apportionment among the several States, and without regard to any census or enumeration."  U.S. Const. amend. XVI.  The Supreme Court recognized in Brushaber v. Union Pac. R.R. Co., one year after the Sixteenth Amendment's ratification, that the purpose of the Amendment was to do away with the implications of its holding in Pollock v. Farmers' Loan & Trust Co.: that is, to relieve taxation of income, from whatever source derived, of the apportionment requirement.   Brushaber v. Union Pac. R.R. Co., 240 U.S. at 18.   Thus, the Supreme Court noted that "[t]he Sixteenth Amendment must be construed in connection with the taxing clauses of the original Constitution and the effect attributed to them before the amendment was adopted."   Eisner v. Macomber, 252 U.S. at 205.   The Tenth Circuit, similarly, has noted that "Article I, section 8 and the sixteenth amendment [] empowers Congress to create and provide for the administration of an income tax . . . . "   United States v. Collins, 920 F.2d 619, 629 (10th Cir. 1990).   Accord United States v. Tedder, 787 F.2d 540, 542 (10th Cir. 1986)("The Sixteenth Amendment specifically empowers Congress to enact an income tax.").

-59-

The Supreme Court has concluded that "income" as used in the Constitution means any accession to wealth.   In Eisner v. Macomber, the Supreme Court was tasked with construing the term income as it is used in the Sixteenth Amendment to decide whether Congress had the power to tax a stock dividend made to the taxpayer.   See 252 U.S. at 199.   The Supreme Court noted that, to decide whether a form of payment or gain of property is income, "it [is] essential to distinguish between what is and what is not 'income,' as that term is [] used [in Article I, § 8 and the Sixteenth Amendment] . . . . Congress cannot by any definition it may adopt conclude the matter, since it cannot by legislation alter the Constitution . . . ."   252 U.S. at 206.   The Supreme Court concluded that "a clear definition of the term income . . . . may be . . . gain from capital, from labor, or from both combined . . . ."   252 U.S. at 206-07 (quoting Doyle v. Mitchell Bros. Co., 247 U.S. 179, 185 (1918))(internal quotation marks omitted).   In C.I.R. v. Glenshaw Glass Co., the Supreme Court was again tasked with construing income, but this time as Congress used that term in the IRC, and held that the term income is broader than gain from any source derived, it is any "accession to wealth."   348 U.S. at 427, 431.   The Supreme Court came to this definition in holding that punitive damages, although not "gain derived from capital, from labor, or from both combined," are nevertheless income subject to taxation, because they are "instances of undeniable accessions to wealth, clearly realized, and over which the taxpayers have complete dominion."   348 U.S. at 431.   The Supreme Court reasoned that it "has given a liberal construction to this broad phraseology [of income] in recognition of the intention of Congress to tax all gains except those [that Congress] specifically exempted," and nowhere in the IRC does Congress exempt punitive damages.   348 U.S. at 430.

   3.   **Constitutional Constraints on Taxation.**

The Supreme Court has recognized that there are limits on the constitutionality of imposing

taxes on the exercise of certain rights or privileges by taxing activities, but that it is constitutional

to tax income from engaging in constitutionally protected rights and privileges.   See Murdock v.

Pennsylvania, 319 U.S. 105, 112 (1943)("It is one thing to impose a tax on the income or property

of a preacher. It is quite another thing to exact a tax from him for the privilege of delivering a

sermon.").   In Follett v. Town of McCormick, S.C., 321 U.S. 573 (1944), the Supreme Court

stated:

> The exaction of a tax as a condition to the exercise of the great liberties guaranteed
> by the First Amendment is as obnoxious as the imposition of a censorship or a
> previous restraint. For . . . "the power to tax the exercise of a privilege is the power
> to control or suppress its enjoyment."

321 U.S. at 577 (citations omitted)(quoting)) (citing Near v. Minnesota, 283 U.S. 697 (1931)).   In

Follett v. Town of McCormick, S.C., the Supreme Court held that a required licensing fee imposed

by city ordinance on "Agents selling books . . . " was unconstitutional when applied to a Jehovah's

Witness distributing or selling books to townspersons.   321 U.S. at 574, 577.   It noted that "[t]he

question is . . . a narrow one. It is whether a flat license tax as applied too one who earns his

livelihood as an evangelist or preacher in his home town is constitutional."   321 U.S. at 576.   The

Supreme Court opined: "A flat license tax on that constitutional privilege would be as odious as

the early 'taxes on knowledge' which the framers of the First Amendment sought to outlaw."   321

U.S. at 577 (quoting Grosjean v. Am. Press Co., 297 U.S. 233, 246 (1936)).   The Supreme Court

took care to also point out, however, that "[t]he exemption from a license tax of a preacher who

preaches or a parishioner who listens does not mean that either is free from all financial burdens of

government, including taxes on income or property."   Follett v. Town of McCormick, S.C., 321

U.S. at 577-78.   Similarly, in Murdock v. Pennsylvania, the Supreme Court held that the arrests of

certain Jehovah's Witnesses for violation certain municipal ordinances levying a tax on revenue

-61-

from door-to-door sales of books and pamphlets was unconstitutional.  319 U.S. at 118.  The

Supreme Court reasoned that "[t]hose who can tax the exercise of this religious practice can make

its exercise so costly as to deprive it of the resources necessary for its maintenance."  319 U.S. at

112.  Justice Stanley Reed noted in his dissenting opinion that "the First Amendment wholly

exempts the church and press from a privilege tax, presumably by the national as well as the state

governments."  319 U.S. at 133 (Reed, J. dissenting).   In Murdock v. Pennsylvania, the Supreme

Court made an important distinction between a flat tax for engaging in an activity or "enjoyment of

a right" -- which is unconstitutional -- and an income tax that taxes the income derived from

engaging in the activity -- which is constitutional.

> It is one thing to impose a tax on the income or property of a preacher. It is quite
> another thing to exact a tax from him for the privilege of delivering a sermon.
>
> . . . .
>
>     It is contended, however, that the fact that the license tax can suppress or
> control this activity is unimportant if it does not do so. But that is to disregard the
> nature of this tax.  It is a license tax-a flat tax imposed on the exercise of a
> privilege granted by the Bill of Rights.  A state may not impose a charge for the
> enjoyment of a right granted by the federal constitution.  Thus, it may not exact a
> license tax for the privilege of carrying on interstate commerce, although it may tax
> the property used in, or the income derived from, that commerce, so long as those
> taxes are not discriminatory.

Murdock v. Pennsylvania, 319 U.S. at 112-13 (internal citations omitted).

In the context of an asserted substantive due process right, such as violation of a person's

liberty interest, the Supreme Court has made clear: "Except in rare and special instances, the due

process of law clause contained in the Fifth Amendment is not a limitation upon the taxing power

conferred upon Congress by the Constitution . . . . "   A. Magnano Co. v. Hamilton, 292 U.S. 40,

44 (1934)(footnote and citations omitted).  The Supreme Court held that the Constitution's due

process clause is applicable to "a taxing statute . . . only if the act be so arbitrary as to compel the

-62-

conclusion that it does not involve an exertion of the taxing power, but constitutes, in substance and effect, the direct exertion of a different and forbidden power, as, for example, the confiscation of property." A. Magnano Co. v. Hamilton, 292 U.S. at 44.   Such a direct exertion of a forbidden power has been found in cases in which the tax examined is so unreasonable that it cannot relate to the public welfare or the legitimate interest in raising revenue, but rather "exhibits [] an intent to prohibit and to punish . . . . " United States v. Constantine, 296 U.S. 287, 295 (1935).   See Child Labor Tax Case, 259 U.S. 20, 38 (1922)("[T]here comes a time in the extension of the penalizing features of the so-called tax when it loses its character as such and becomes a mere penalty, with the characteristics of regulation and punishment.").   In the Child Labor Tax Case, the Supreme Court held unconstitutional a ten percent tax exacted on a company's annual net profits where the company employed a child under fourteen-years-old, reasoning that "the sole objection to the tax here was its excessive character.   Nothing else appeared on the face of the act.   It was an increase of a tax admittedly legal to a higher rate and that was all." 259 U.S at 41.   Similarly, in United States v. Constantine, the Supreme Court invalidated on constitutional grounds an annual $1,000.00 excise tax on liquor sales, because "the section exhibits [] an intent to prohibit and to punish violations of state law . . . [which] are too strong to be disregarded, remove all semblance of a revenue act and stamp the sum it exacts as a penalty."   296 U.S. at 295.

## THE INTERNAL REVENUE CODE'S TAXATION OF INCOME

Section 61 of the IRC provides Congress' statutory definition for income: "Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) . . . Compensation for services . . . ."   26 U.S.C. § 61(a)(1).   The Supreme Court has recognized that Congress' definition of income in the IRC, which includes "compensation from personal service . . . from professions . . . . ," is constitutional, as "this

-63-

language was used by Congress to exert in this field 'the full measure of its [constitutional] taxing power.'"  C.I.R. v. Glenshaw Glass Co., 348 U.S. at 476 (quoting Helvering v. Clifford, 309 U.S. at 334).  For the exceptions to gross income provided in the subtitle, § 61 directs the reader to "part III (sec. 101 and following)." 26 U.S.C. § 61(a)(2).  Section III, Subchapter B of the IRC provides particular items that are excepted, or deducted, from one's gross income.  See 26 U.S.C. §§ 101 - 139.  These exceptions or deductions income that Congress has specifically excluded, examples of which include long-standing income tax deductions for interest on state and local bonds, see 26 U.S.C. § 103, and certain death benefits, see 26 U.S.C. § 101, more recent deductions include certain employer-provided benefits, such as employer-provided health benefits to employees, see 26 U.S.C. § 132, to recently enacted deductions, such as COBRA[9] premium assistance enacted in 2009, see 26 U.S.C. § 139C.  It is thus clear from the IRC's structure that Congress' definition of income is inclusive, and is intended to cover all accessions to wealth other than those Congress explicitly excepts in Subchapter B.  Accord C.I.R. v. Jacobson, 336 U.S. 28, 49 (1949)("The income taxed is described in sweeping terms and should be broadly construed in accordance with an obvious purpose to tax income comprehensively.  The exemptions, on the

---

[9] COBRA refers to the Consolidated Omnibus Budget Reconciliation Act of 1985, Pub. L. 99-272, 100 Stat. 82 (codified in various sections of Titles 7, 10, 15, 19, 29 33, 38, 42, and 47 of the United States Code). Part of COBRA provides workers the right to choose to continue group health benefits that their group health plan provides for themselves and their families for limited periods of time under certain circumstances such as voluntary or involuntary job loss, reduction in the hours worked, transition between jobs, death, divorce, and other life events.  See United States Dep't of Labor, Health Plans & Benefits: Continuation of Health Coverage -- COBRA, http://www.dol.gov/dol/topic/health-plans/cobra.htm (last visited Feb. 6, 2013).  Congress enacted the COBRA premium assistance in 2009 as part of the American Recovery and Reinvestment Act, Pub. L. 111-5, 123 Stat. 115 (Feb. 17, 2009)(codified in various sections of Titles 6, 19, 26, 42, and 47, to aid employees who experienced involuntary terminations on or before May 31, 2010.  See United States Dep't of Labor, COBRA Continuation Coverage, http://www.dol.gov/dol/topic/health-plans/cobra.htm (last visited Feb. 6, 2013).

other hand, are specifically stated and should be construed with restraint in the light of the same policy.").

Section 861 of the IRC is part of Subchapter N, which makes explicit that "[c]ompensation for labor or personal services performed in the United States" is income from within the United States, and thus not foreign income which may be exempt or excepted from computation of a taxpayer's income for federal income tax purposes.  26 U.S.C. § 861(a)(3).  As the Honorable Norman H. Wolfe, United States Special Trial Judge for the United States Tax Court, noted: "The rules of sections 861-865 have significance in determining whether income is considered from sources within or without the United States.  The source rules do not exclude from U.S. taxation income earned by U.S. citizens from sources within the United States."  Corcoran v. C.I.R., 83 T.C.M. (CCH) 1107, at *2 (T.C. 2002).  See Great-West Life Assur. Co. v. United States, 678 F.2d 180, 183 (Ct. Cl. 1982)("The determination of where income is derived or 'sourced' is generally of no moment to either United States citizens or United States corporations, for such persons are subject to tax under [IRC] section 1 and section 11, respectively, on their worldwide income.").  The Treasury Regulations promulgated pursuant to 26 U.S.C. § 861 also clarify that gross income from services performed within the United States includes compensation for labor and personal services performed within the United States.  Section 1.861-4 of Title 26 of the Code of Federal Regulations provides:

> **(a) Compensation for labor or personal services performed wholly within the United States. (1)** Generally, compensation for labor or personal services, including fees, commissions, fringe benefits, and similar items, performed wholly within the United States is gross income from sources within the United States. Gross income from sources within the United States includes compensation for labor or personal services performed in the United States irrespective of the residence of the payer, the place in which the contract for service was made, or the place or time of payment; except that such compensation shall be deemed not to be income from sources within the United States, if --

**(i)** The labor or services are performed by a nonresident alien individual temporarily present in the United States for a period or periods not exceeding a total of 90 days during his taxable year,

**(ii)** The compensation for such labor or services does not exceed in the aggregate a gross amount of $3,000, and

**(iii)** The compensation is for labor or services performed as an employee of, or under any form of contract with--

(a) A nonresident alien individual, foreign partnership, or foreign corporation, not engaged in trade or business within the United States, or

(b) An individual who is a citizen or resident of the United States, a domestic partnership, or a domestic corporation, if such labor or services are performed for an office or place of business maintained in a foreign country or in a possession of the United States by such individual, partnership, or corporation.

26 C.F.R. § 861-4.   See In re Clark, 98-24204-608, 2001 WL 1807509, at *6 (Bankr. E.D.N.Y.

Dec. 7, 2001)("26 C.F.R. § 1.861-4 provides that gross income from services within the United

States (which is taxable) includes compensation for labor or personal services performed in the

United States.")

## **RELEVANT LAW REGARDING CRIMINAL TAX EVASION**

Tax evasion is a felony under the Internal Revenue Code, 26 U.S.C. § 7201.   It covers the

willful attempt to evade or defeat the assessment or payment of a tax.   See United States v. Mal,

942 F.2d 682, 686-88 (9th Cir. 1991).   The elements of the offense are:

*First*: the defendant [or another person] owed substantial income tax . . . ;

*Second*: the defendant intended to evade and defeat payment of that [] tax;

*Third*: the defendant committed an affirmative act in furtherance of this intent, that is s/he [describe affirmative act as alleged in indictment]; and

*Fourth*: the defendant acted willfully, that is, with the voluntary intent to

violate a known legal duty.

Tenth Circuit Pattern Jury Instructions Criminal § 2.92, at 312 (2011). "To obtain a conviction for evasion, the government must prove three elements: 1) the existence of a substantial tax liability, 2) willfulness, and 3) an affirmative act constituting an evasion or attempted evasion of the tax." United States v. Meek, 998 F.2d 776, 779 (10th Cir. 1993)(citing Sansone v. United States, 380 U.S. 343, 351 (1965)).   The Tenth Circuit has noted: "The felony offense of willfully attempting to evade taxes is the 'capstone of a system of sanctions which singly or in combination were calculated to induce prompt and forthright fulfillment of every duty under the income tax law.'" United States v. Meek, 998 F.2d at 779 (quoting Spies v. United States, 317 U.S. 492, 497 (1943)).

To establish the existence of a substantial amount of tax liability, it is not necessary to prove the exact amount of the tax due.   See United States v. Mounkes, 204 F.3d 1024, 1028 (10th Cir. 2000)(finding a substantial liability where "[t]he government's evidence showed that the Mounkeses' bank deposits and cash expenditures exceeded their reported income after adjustments for applicable exemptions and deductions.   Such evidence supports an inference that defendants had unreported income.").   "The word 'substantial,' as applicable here, is necessarily a relative term and not susceptible of an exact meaning."   Canady v. United States, 354 F.2d 849, 851-52 (8th Cir. 1966).   The requirement of an affirmative act distinguishes the felony offense of tax evasion from the misdemeanor offense of willful failure to file a tax return.   An affirmative act to evade tax is a positive act of commission designed to mislead or conceal. United States v. Meek, 998 F.2d 779 ("It is the requirement of an affirmative act that distinguishes the offense of evasion from the misdemeanor offense of willful failure to file a tax return.").   Misstating income is an affirmative act.   See United States v. Jones, 816 F.2d 1483, 1488 (10th Cir. 1987)("Defendant's filing of his tax returns with the knowledge that he should have reported more income is sufficient

to sustain the jury's conclusion that defendant willfully attempted to evade taxes.")(citing <u>Sansone v. United States</u>, 380 U.S. at 351-52).

<b>LAW REGARDING INTERNAL REVENUE CODE ON ASSESSMENTS,<br><u>FEDERAL TAX LIENS, AND NOTICES OF LIENS</u></b>

An assessment is a bookkeeping entry "recording the liability of the taxpayer."   26 U.S.C. § 6203.   An assessment is made when a taxpayer "[s]elf-assesses," <u>i.e.</u>, files a personal income tax return, or, when the IRS prepares a substitute for return ("SRF"), under 26 U.S.C. § 6020(b).   The assessment is important to creation of a federal tax lien.   <u>See</u> 26 U.S.C. § 6321, 6322.

A federal tax lien which arises under 26 U.S.C. § 6321 arises against a taxpayer on the date that the IRS makes its assessment.   <u>See</u> 26 U.S.C. § 6322 ("Unless another date is specifically fixed by law, the lien imposed by section 6321 shall arise at the time the assessment is made and shall continue until the liability for the amount so assessed . . . is satisfied or becomes unenforceable by reason of lapse of time.").   The Supreme Court has noted that the tax lien arising under 26 U.S.C. § 6321 is a valid exercise of Congress' constitutional tax and spending power. <u>See</u> <u>State of Mich. v. United States</u>, 317 U.S. 338, 340 (1943)("The establishment of a tax lien by Congress is an exercise of its constitutional power 'To lay and collect Taxes'")(citing U.S. Const. Art. I, § 8).   The IRS tax lien is effective against all property and rights to property, whether real or personal, including after-acquired property belonging to the taxpayer.   <u>See</u> <u>Texas Commerce Bank-Fort Worth, N.A. v. United States</u>, 896 F.2d 152, 161 (5th Cir. 1990)("The lien arises on the date that the IRS assesses unpaid taxes, applies to currently owned as well as after-acquired property, and continues until the taxpayer satisfies the debt, or the statute of limitations runs."). The federal tax lien remains valid and enforceable until the debt is fully satisfied or becomes unenforceable by reason of lapse of time.   <u>See</u> 26 U.S.C. § 6322.   The IRS tax lien is fully

-68-

perfected and enforceable against the taxpayer upon assessment; to prevail against the taxpayer, there is no need for the IRS to file a notice of lien in the public records.   See W. Nat'l Bank v. United States, 812 F. Supp. 703, 705 (W.D. Tex. 1993); In re Kohout, 236 B.R. 365, 369 (Bankr. N.D. Ohio 1999).   The statutory lien under 26 U.S.C. § 6321 is silent and is always given priority unless one of the exceptions in 26 U.S.C. § 6323 applies.   See Western Nat'l Bank v. United States, 812 F. Supp. at 705.

Section 6323(a) of Title 26 of the United States Code provides that a federal tax lien "shall not be valid as against any purchaser, holder of a security interest, mechanic's lienor, or judgment lien creditor until notice thereof which meets the requirements of subsection (f) has been filed by the Secretary."   26 U.S.C. § 6323(a).   The IRS files a notice of federal tax lien, in part, to protect the priority of its lien against third parties, identified in 26 U.S.C. § 6323(a), that also claim an interest in the taxpayer's property.   For purposes of determining priority between a federal tax lien and a competing lien, "absent provision to the contrary, priority for purposes of federal law is governed by the common-law principle that 'first in time is the first in right.'" United States v. McDermott, 507 U.S. 447, 449 (1993).   See United States v. New Britain, 347 U.S. 81, 85 (1954). Congress has determined in enacting 26 U.S.C. § 6323(a) that, once a notice of the federal tax lien has been filed under 26 U.S.C. § 6323(f), the IRS tax lien shall have priority over the subsequent lien of a competing judgment lien holder or choate interest of a bone fide purchaser.   See 26 U.S.C. § 6323 (b)-(c).

IRS Forms 4340 are prima facie evidence of tax liability.   "For purposes of granting summary judgment, a Certificate of Assessment and Payments is sufficient evidence that an assessment was made in the manner prescribed by § 6203 and Treas. Reg. 301.6203-1."   Long v. United States, 972 F.2d 1174, 1181 (10th Cir. 1993)(citing James v. United States, 970 F.2d 750,

755 (10th Cir. 1992); Hughes v. United States, 953 F.2d 531, 539-40 (9th Cir. 1992)).   See United

States v. Silkman, 220 F.3d 935, 937 (8th Cir. 2000); United States v. Voorhies, 658 F.2d 710, 715

(9th Cir, 1981)("[T]he certificates of assessment were prima facie correct and therefore adequate

evidence of the amount of [the taxpayer's] tax liability.").   Cf. McCarty v. United States, 929 F.2d

1085, 1089 (5th Cir. 1991)(holding that Form 4340 showing "notice of assessment and demand for

payment" is admissible under the Federal Rules of Evidence).

### RELEVANT LAW REGARDING RES JUDICATA AND ISSUE PRECLUSION

"Under res judicata . . . a final judgment on the merits of an action precludes the parties or

their privies from relitigating issues that were or could have been raised in the prior action."

Wilkes v. Wyo. Dep't of Emp't Div. of Labor Standards, 314 F.3d 501, 503-04 (10th Cir. 2002).

The general rule is that "[t]he appealability of a judgment . . . does not hinder its preclusive effect."

MACTEC, Inc. v. Gorelick, 427 F.3d 821, 832 (10th Cir. 2005)(citing 18A Charles A. Wright,

Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 4433, at 78-85 (2d ed.

2002)).   Accord Leo v. Garmin Intern., Inc., 464 F. App'x 737, 740 (10th Cir. 2012)("[I]t does not

matter that [the plaintiff's] first appeal had not been resolved at the time [he] filed his second suit

because under the federal law of claim preclusion, the district court's order was final for res

judicata purposes.").   Courts occasionally refer to the two different effects of judgments under the

doctrine of res judicata with various and sometimes conflicting terminology.   See 18 C. Wright,

A. Miller & E. Cooper, supra, § 4402, at 7 ("The effects of former adjudication have been

discussed and determined in varying and occasionally conflicting terminology."). "[T]he broad

'res judicata' phrase refers to the distinctive effects of a judgment separately characterized as

'claim preclusion' and 'issue preclusion.'"   18 C. Wright, A. Miller & E. Cooper, supra, § 4402,

at 7.   The United States Court of Appeals for the Fifth Circuit has presented a summary that

explains the two doctrines:

> The rules of res judicata, as the term is sometimes sweepingly used, actually comprise two doctrines concerning the preclusive effect of a prior adjudication. The first such doctrine is "claim preclusion," or true res judicata. It treats a judgment, once rendered, as the full measure of relief to be accorded between the same parties on the same "claim" or "cause of action." Sea-Land Services, Inc. v. Gaudet, 1974, 414 U.S. 573, 578-79 . . . .   When the plaintiff obtains a judgment in his favor, his claim "merges" in the judgment; he may seek no further relief on that claim in a separate action. Conversely, when a judgment is rendered for a defendant, the plaintiff's claim is extinguished; the judgment then acts as a "bar." Angel v. Bullington, 1947, 330 U.S. 183 . . . .   Cf. Cleckner v. Republic Van and Storage Co., 5 Cir. 1977, 556 F.2d 766. . . .   Under these rules of claim preclusion, the effect of a judgment extends to the litigation of all issues relevant to the same claim between the same parties, whether or not raised at trial.   Garner v. Giarrusso, 5 Cir. 1978, 571 F.2d 1330 (1978); International Assoc. of Machinists & Aerospace Workers v. Nix, 5 Cir. 1975, 512 F.2d 125, 131; Blanchard v. St. Paul Fire and Marine Ins. Co., 5 Cir. 1965, 341 F.2d 351, 359. . . .   The aim of claim preclusion is thus to avoid multiple suits on identical entitlements or obligations between the same parties, accompanied, as they would be, by the redetermination of identical issues of duty and breach.

> The second doctrine, collateral estoppel or "issue preclusion," recognizes that suits addressed to particular claims may present issues relevant to suits on other claims.   In order to effectuate the public policy in favor of minimizing redundant litigation, issue preclusion bars the relitigation of issues actually adjudicated, and essential to the judgment, in a prior litigation between the same parties. Harris v. Washington, 1971, 404 U.S. 55 . . . .   It is insufficient for the invocation of issue preclusion that some question of fact or law in a later suit was relevant to a prior adjudication between the parties; the contested issue must have been litigated and necessary to the judgment earlier rendered.

Kaspar Wire Works, Inc. v. Leco Eng'g & Mach., Inc., 575 F.2d 530, 535-36 (5th Cir. 1978).

"The doctrine of res judicata, or claim preclusion, 'bars a second suit involving the same parties or their privies based on the same cause of action.'"   Roybal v. City of Albuquerque, No. CIV.08-0181 JB/LFG, 2009 WL 1300048, at *5 (D.N.M. Feb. 2, 2009)(Browning, J.)(quoting Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 n.5 (1979)).   "Under Tenth Circuit law, claim preclusion applies when three elements exist: (1) a final judgment on the merits in an earlier action; (2) identity of the parties in the two suits; and (3) identity of the cause of action in both

suits." MACTEC, Inc. v. Gorelick, 427 F.3d at 831. The Tenth Circuit has adopted the Restatement (Second) of Judgments § 24's "transactional" approach to determine what constitutes a "cause of action" for claim preclusion. Wilkes v. Wyo. Dep't of Emp't Div. of Labor Standards, 314 F.3d at 504. Under this approach, a cause of action includes "all claims or legal theories of recovery that arise from the same transaction, event, or occurrence." Wilkes v. Wyo. Dep't of Emp't Div. of Labor Standards, 314 F.3d at 504 (quoting Nwosun v. Gen. Mills Rest., Inc., 124 F.3d 1255, 1257 (10th Cir. 1997)). Claim preclusion does not, however, "extend from criminal prosecutions to civil actions." 18B C. Wright, A. Miller & E. Cooper, supra, § 4474, at 420.

Where the causes of action are not identical, the second aspect of the doctrine of res judicata, termed "collateral estoppel" or "issue preclusion," may still preclude parties from relitigating issues in a second, not identical cause of action, where the particular issues were litigated in a prior case. See In re Corey, 583 F.3d 1249, 1251 (10th Cir. 2009)("The doctrine of issue preclusion prevents a party that has lost the battle over an issue in one lawsuit from relitigating the same issue in another lawsuit."). The Tenth Circuit has stated: "Under federal law, issue preclusion attaches only when an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment." In re Corey, 583 F.3d at 1251 (quoting Arizona v. California, 530 U.S. 392, 414 (2000); Restatement (Second) of Judgments § 27 cmt. e.)(internal quotations and alterations omitted). See Restatement (Second) of Judgments § 27 ("When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim."). The Tenth Circuit's test for issue preclusion under res judicata consists of four elements:

(1) the issue previously decided is identical with the one presented in the action in

question, (2) the prior action has been fully adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party, or in privity with a party, to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1093 (10th Cir. 2003)(quoting United States v. Botefuhr, 309 F.3d 1263, 1282 (10th Cir. 2002)).

"It is well established that a prior criminal conviction may work an estoppel in favor of the Government in a subsequent civil proceeding." Emich Motors Corp. v. General Motors Corp., 340 U.S. 558, 568 (1951). See Considine v. United States, 683 F.2d 1285, 1286 (9th Cir. 1982)("A prior conviction will estop a party from contesting in a later civil suit any element necessarily established in the criminal trial."). The Tenth Circuit has stated that whether a defendant is estopped from relitigating an issue after a criminal trial "is whether the question was 'distinctly put in issue and directly determined' in the criminal prosecution." Metros v. U.S. Dist. Court for the Dist. of Colo., 441 F.2d 313, 316 (10th Cir. 1970)(quoting Emich Motors Corp. v. General Motors Corp., 340 U.S. at 569). Thus, "[i]n the case of a criminal conviction based on a jury verdict of guilty, issues which were essential to the verdict must be regarded as having been determined by the judgment." Metros v. U.S. Dist. Court for the Dist. of Colo., 441 F.2d at 316 (quoting Emich Motors Corp. v. General Motors Corp., 340 U.S. at 569)(internal quotations omitted). "With respect to issues determined in a criminal prosecution: (1) A judgment in favor of the prosecuting authority is preclusive in favor of the government: (a) In a subsequent civil action between the government and the defendant in the criminal prosecution, as stated in § 27 with the exceptions stated in § 28." Restatement (Second) of Judgments § 85.

## ANALYSIS

The Hopkins have a fundamental right to engage in a common occupation, protected under

-73-

the Fifth Amendment's Due Process Clause.   The income derived from engaging in that right,

however, is subject to Congress' tax power as expressed in the Constitution's Article I, § 8 and the

Sixteenth Amendment.   Because the jury in the Hopkins' criminal trial necessarily concluded that

the Hopkins owe a substantial amount of tax and that they used nominees to shield their assets and

evade their tax liability, the Hopkins are precluded from relitigating those issues in this civil case.

A lien arose in favor of the IRS when they assessed the Hopkins' tax liability, and because there is

no genuine issue as to the material fact that the amount reflected on the IRS assessments is valid

and owing, the United States is entitled to summary judgment as a matter of law and is thus entitled

to foreclose on its liens.

I.    **THE IRS ASSESSMENTS ARE VALID AND ENFORCEABLE AGAINST THE HOPKINS' BECAUSE THE UNITED STATES' TAXATION OF THEIR INCOME IS CONSTITUTIONAL.**

The Hopkins assert that the right to work is a fundamental right, that may be self-evident,

and that income from exercising this fundamental right -- income from working -- is exempt from

taxation.   They contend that, because the IRS assessments in the Forms 4340 were assessed based

on tax calculated from the Hopkins' income from working, the assessments are unconstitutional

and thus invalid.   The Hopkins concede that, if they are wrong, if the Constitution gives to

Congress the power to tax the income from their labor, then the facts that the United States sets

forth as undisputed in their Motion for Summary Judgment are indeed correct and undisputed.

A.    **THE SUBSTANTIVE DUE-PROCESS RIGHT TO ENGAGE IN A COMMON OCCUPATION OR PROFESSION IS SUBJECT TO CONGRESS' CONSTITUTIONAL TAX POWER.**

The Hopkins are correct that a "fundamental privilege[]" to engage in a common

occupation exists, which substantive due-process protects.   Butchers' Union Co., 111 U.S. at 762.

The Supreme Court has noted that "[i]t is undoubtedly the right of every citizen of the United

States to follow any lawful calling, business, or profession he may choose . . . . This right may in many respects be considered as a distinguishing feature of our republican institutions." Dent v. West Virginia, 129 U.S. at 121.   The Supreme Court has recognized that the right "to engage in any of the common occupations of life " is a liberty interest protected under the Fourteenth Amendment's Due Process Clause. Meyer v. Nebraska, 262 U.S. at 399.   Here, because the Hopkins assert that it is the federal government, not the state government, that is infringing on their liberty interest to engage in their occupations, it is the Fifth Amendment, rather than the Fourteenth Amendment, which protects such a right from the United States' infringement.   See Hibben v. Smith, 191 U.S. at 325 ("The 14th Amendment, it has been held, legitimately operates to extend to the citizens and residents of the states the same protection against arbitrary state legislation affecting life, liberty, and property as is offered by the 5th Amendment against similar legislation by Congress."). While the Hopkins have a liberty interest in their right to engage in a common occupation -- or, for M. Hopkins to engage in working as a physician -- the Supreme Court has made clear that this right is not without its limitations and that, to have a government and well-ordered society, the government may put some restrictions and limitations on the right to work and the fruits of one's labor.

The Supreme Court in Dent v. West Virginia recognized that the right to engage in a common occupation is subject to generally applicable restrictions.   See Dent v. West Virginia 129 U.S at 121( "It is undoubtedly the right of every citizen of the United States to follow any lawful calling, business, or profession he may choose, subject only to such restrictions as are imposed upon all persons of like age, sex, and condition."). The Supreme Court imposed a lower bar for generally applicable restrictions in Meyer v. Nebraska, stating that the right to engage in one's chosen occupation may be regulated unless the "legislative action [] is arbitrary or without

reasonable relation to some purpose within the competency of the state to effect."   262 U.S. at 399-400.   That the government may regulate or impose limitations on the fundamental right to engage in one's common occupation, a right that the Supreme Court opined in <u>Dent v. West Virginia</u> may be "a distinguishing feature of our republican institutions," 129 U.S. at 121, finds support in the Supreme Court's explanation of our theory of government as a government ruled by laws, to which the people, as sovereigns, consented to abide in ratifying the Constitution:

> When we consider the nature and the theory of our institutions of government, the principles upon which they are supposed to rest, and review the history of their development, we are constrained to conclude that they do not mean to leave room for the play and action of purely personal and arbitrary power. Sovereignty itself is, of course, not subject to law, for it is the author and source of law; but in our system, while sovereign powers are delegated to the agencies of government, sovereignty itself remains with the people, by whom and for whom all government exists and acts. And the law is the definition and limitation of power. It is, indeed, quite true that there must always be lodged somewhere, and in some person or body, the authority of final decision; and in many cases of mere administration, the responsibility is purely political, no appeal lying except to the ultimate tribunal of the public judgment, exercised either in the pressure of opinion, or by means of the suffrage. But the fundamental rights to life, liberty, and the pursuit of happiness, considered as individual possessions, are secured by those maxims of constitutional law which are the monuments showing the victorious progress of the race in securing to men the blessings of civilization under the reign of just and equal laws, so that, in the famous language of the Massachusetts bill of rights, the government of the commonwealth 'may be a government of laws and not of men.' For the very idea that one man may be compelled to hold his life, or the means of living, or any material right essential to the enjoyment of life, at the mere will of another, seems to be intolerable in any country where freedom prevails, as being the essence of slavery itself.
>
> There are many illustrations that might be given of this truth, which would make manifest that it was self-evident in the light of our system of jurisprudence. The case of the political franchise of voting is one. Though not regarded strictly as a natural right, but as a privilege merely conceded by society, according to its will, under certain conditions, nevertheless it is regarded as a fundamental political right, because preservative of all rights. In reference to that right, it was declared by the supreme judicial court of Massachusetts, in <u>Capen v. Foster</u>, 12 Pick. 485, 488, . . . 'that in all cases where the constitution has conferred a political right or privilege, and where the constitution has not particularly designated the manner in which that right is to be exercised, it is clearly within the just and constitutional limits of the

legislative power to adopt any reasonable and uniform regulations, in regard to the time and mode of exercising that right, which are designed to secure and facilitate the exercise of such right in a prompt, orderly, and convenient manner;' nevertheless, 'such a construction would afford no warrant for such an exercise of legislative power as, under the pretense and color of regulating, should subvert or injuriously restrain, the right itself.' It has accordingly been held generally in the states that whether the particular provisions of an act of legislation establishing means for ascertaining the qualifications of those entitled to vote, and making previous registration in lists of such, a condition precedent to the exercise of the right, were or were not reasonable regulations, and accordingly valid or void, was always open to inquiry, as a judicial question. See Daggett v. Hudson, 3 N. E. Rep. 538 . . . .

Yick Wo v. Hopkins, 118 U.S. 356, 369-71 (1886). The Hopkins' right to work, and M. Hopkins' right to engage in his profession as a physician, as the Supreme Court recognized in Dent v. West Virginia, Meyers v. Nebraska, and Butchers' Union Co., is subject to reasonable and generally applicable regulation. See Butchers' Union Co., 111 U.S. at 763 ("the proposition, (which I deem a fundamental one,) that the ordinary pursuits of life, forming the large mass of industrial avocations, are and ought to be free and open to all, subject only to such general regulations, applying equally to all, as the general good may demand.")(emphasis added). As the Supreme Court noted in Yick Wo v. Hopkins, while our society protects the rights to life, liberty, and the pursuit of happiness, part of living in a civilized society is to submit to the rule of law rather than to the rule of individuals. Just as the Supreme Court has recognized that government has the ability to regulate and make laws regarding the exercise of the fundamental privilege to vote, the United States also has the ability to regulate and legislate with regard to the right to engage in one's chosen profession. Cf. Williamson v. Lee Optical of Okla., 348 U.S. 483 (1955)(upholding Oklahoma law prohibiting opticians from fitting or duplicating lenses without a prescription that the lower court held "arbitrarily interfere[ed] with the optician's right to do business," while noting that "[t]he Oklahoma law may exact a needless, wasteful requirement,"

-77-

reasoning: "The day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought").   The Hopkins' right to engage in their professions -- or the fundamental right to their labor -- is not absolute and is not above government action, regulation, or law.

### B.   FEDERAL TAXATION OF THE HOPKINS' EARNINGS IS CONSTITUTIONAL.

The Tenth Circuit in <u>United States v. Stillhammer</u>, 706 F.2d 1072 (10th Cir. 1983), discussed at length Congress' broad power to tax earnings, both before and after the Sixteenth Amendment, in the context of a pro se plaintiff's contention that the Sixteenth Amendment was directed at taxation of businesses only, rather than at taxation of individuals:

> Following ratification of the Sixteenth Amendment, the Supreme Court observed that the Amendment granted no new power to Congress, but merely freed it to exercise the taxing power granted in Article I, Section 8, in taxing income without the restriction of apportioning the tax among the states, and without regard to any census or enumeration, a condition placed on direct taxes by Article I, Section 9. <u>Brushaber v. Union Pacific R.R.</u>, 240 U.S. 1, 17-19 . . . (1916). Prior to the ratification of the Amendment, an income tax act had been held partially invalid because of the Article I conditions, based on a finding that the tax was a direct tax as applied to income, such as rents, derived from real property. <u>Pollock v. Farmers' Loan & Trust Co.</u>, 157 U.S. 429 . . . (1895). It is unnecessary to delve into the difficult question of the distinction between direct and indirect taxes because even a cursory study of these early cases teaches that the power of Congress to impose an income tax on salaries and wages has never been seriously doubted. In <u>Pollock</u> the Court stated:
>
> > [T]he power of Congress to tax is a very extensive power. It is given in the Constitution, with only one exception and only two qualifications. Congress cannot tax exports, and it must impose direct taxes by the rule of apportionment, and indirect taxes by the rule of uniformity. Thus limited, and thus only, it reaches every subject, and may be exercised at discretion.
>
> 157 U.S. at 557 . . . (quoting <u>The License Tax Cases</u>, 72 U.S. (5 Wall.) 462, 471 . . . (1866)). Thus, prior to ratification of the Sixteenth Amendment Congress could

tax the earnings of individuals. The Amendment was passed to overrule <u>Pollock</u> (<u>see</u> <u>Brushaber</u>, 240 U.S. at 18 . . . ) and to remove the apportionment limitation with respect to the laying and collection of taxes on income. "Congressional power to tax rests in Article 1, Section 8, clause 1 of the Constitution and embraces all conceivable powers of taxation including the power to lay and collect income taxes." <u>United States v. Lawson</u>, 670 F.2d at 927. It is thus too late to argue that the Amendment did not permit taxation of the income of individuals. <u>See</u> <u>Eisner v. Macomber</u>, 252 U.S. 189, 207 . . . (1920)("income," as used in the Sixteenth Amendment, includes "gain derived from capital, from labor, or from both combined," quoting <u>Doyle v. Mitchell Bros. Co.</u>, 247 U.S. 179, 185 . . . provided it be understood to include profit gained through a sale or conversion of capital assets); <u>Metcalf & Eddy v. Mitchell</u>, 269 U.S. 514 . . . (1926)(constitutionality of taxation of income of a private contractor with a state upheld against a challenge to the constitutional power of Congress to tax instrumentalities of a state government). We feel it is clearly implicit in these decisions that Congress has the power to tax the income of individuals.

<u>United States v. Stillhammer</u>, 706 F.2d 1072, 1077-78 (10th Cir. 1983).

As the Hopkins' right to engage in their chosen occupations is a liberty interest that the Fifth Amendment's Due Process Clause protects, "this liberty may not be interfered with, under the guise of protecting the public interest, by legislative action which is arbitrary or without reasonable relation to some purpose within the competency of the state to effect."  <u>Meyer v. Nebraska</u>, 262 U.S. at 399-400.   The issue is thus whether the United States' imposition of tax on the Hopkins' earnings from engaging in their chosen occupations is reasonable and, therefore, constitutional, or whether the imposition of such a tax violates their liberty interest and is thus unconstitutional.   The Supreme Court has recognized that the Constitution, since its enactment, provided to Congress the power to tax income from labor.   Thus, where the people ratified the Constitution, and, shortly thereafter, the Bill of Rights, they recognized the right to labor and its fruits, but also, at the same time, made that right subject to taxation.   The people are sovereign, in creating and ratifying a Constitution as the supreme law of the land, can restrict and limit even fundamental and self-evident rights, as those rights are the people's to make subject to restriction

-79-

at-will.   Moreover, the Supreme Court has reiterated throughout its review of Congress' power to tax, that the power is near absolute, subject only to the constitutional prohibitions and the power of the electorate.   See Nat'l Fed'n of Indep. Bus. v. Sebelius, 132 S.Ct. at 2579 ("Put simply, Congress may tax and spend. This grant gives the Federal Government considerable influence even in areas where it cannot directly regulate. The Federal Government may enact a tax on an activity that it cannot authorize, forbid, or otherwise control."); Pac. Ins. Co. v. Soule, 74 U.S. 433, 445 (1868)("The only limitations imposed [on Congress' tax power] are: . . . that duties, imposts, and excises shall be uniform; and that no duties shall be imposed upon articles exported from any State. With these exceptions, the exercise of the power is, in all respects, unfettered.").   Even in Lochner v. New York, which has been referred to as "the high water mark," Memorandum from William H. Rehnquist to Supreme Court Justice Jackson (1952), reprinted in 117 Cong. Rec. 45, 313, 45, 440-41 (1971), of the Supreme Court's trend of protecting economic liberties, the Supreme Court observed that the right to contract one's labors must submit to the power of the government in certain instances.   See Lochner v. New York, 198 U.S. at 54 ("The state . . . has power to prevent the individual from making certain kinds of contracts . . . . [and] when the state . . . has passed an act which seriously limits the right to labor . . . in regard to their livelihood . . . , it becomes of great importance to determine which shall prevail . . . .").

To the extent that the Hopkins argue that the fundamental right to work may be self-evident, and existed before the Sixteenth Amendment, that argument does not erase the reality that United States' taxation of their income is, and since ratification of the Constitution, has been, constitutional. The people as sovereign gave up that immunity from taxation on their labor and income when the Constitution was adopted.   In holding Congress' definition of income in the IRC constitutional in Eisner v. Macomber, however, the Supreme Court expressly recognized that the

Sixteenth Amendment did not extend Congress' constitutional power to tax and spend, but rather only removed the apportionment requirement.   See Eisner v. Macomber, 252 U.S. at 206 ("As repeatedly held, this did not extend the taxing power to new subjects, but merely removed the necessity which otherwise might exist for an apportionment among the states of taxes laid on income.")(citing Brushaber v. Union Pac. R.R. Co., 240 U. S. at 17-19; Stanton v. Baltic Mining Co., 240 U. S. 103 (1916)).   Thus, the Sixteenth Amendment did not extend substantively the right to tax, meaning that the power to tax income, including payments in exchange for one's labor, existed at the time of the ratification of the Constitution.   The Supreme Court has recognized that Congress' inclusion in IRC's definition of income, "compensation from personal service . . . from professions . . . ," is constitutional, as "this language was used by Congress to exert in this field 'the full measure of its taxing power.'"   C.I.R. v. Glenshaw Glass Co., 348 U.S. at 476 (quoting Helvering v. Clifford, 309 U.S. at 334).   Because, therefore, the Hopkins' wages are constitutionally subject to tax, and because, under Eisner v. Macomber and C.I.R. v. Glenshaw Glass Co., the Supreme Court has recognized that Congress constitutionally has had the power, since ratification of the Constitution, to tax any accession to wealth as income, the United States' imposition of a tax on the Hopkins' earnings is constitutional.

That the taxation of income prevails over the Hopkins' right to the occupation of their choice finds support in the Supreme Court's reasoning in Lochner v. New York.   The Supreme Court in Lochner v. New York held that the federal government's restricting bakers to 60-hour workweeks was unconstitutional, reasoning:

> Viewed in the light of a purely labor law, with no reference whatever to the question of health, we think that a law like the one before us involves neither the safety, the morals, nor the welfare, of the public, and that the interest of the public is not in the slightest degree affected by such an act.

. . . .

It is a question of which of two powers or rights shall prevail, - the power of the state to legislate or the right of the individual to liberty of person and freedom of contract. The mere assertion that the subject relates, though but in a remote degree, to the public health, does not necessarily render the enactment valid. The act must have a more direct relation, as a means to an end, and the end itself must be appropriate and legitimate, before an act can be held to be valid which interferes with the general right of an individual to be free in his person and in his power to contract in relation to his own labor.

Lochner v. New York, 198 U.S. at 57-58.   Accord McCulloch v. Maryland, 17 U.S. 316, 421 (1819)("Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional.").   Regardless whether it is still good law to say that wage-hour restrictions on bakers' working hours does not in the slightest degree affect the public, the Supreme Court has recognized that, with regard to Congress' tax legislation: "The prompt payment of taxes is always important to the public welfare. It may be vital to the existence of a government."   Springer v. United States, 102 U.S. at 594.   Congress' tax power thus prevails over an asserted absolute fundamental right to engage in one's chose occupation, or "the right to labor."   Lochner v. New York, 198 U.S. at 54.   While there might be some constitutional limitations on Congress' ability to tax common trades and professions, such as taxing the right to be a physician and practice medicine to the point of eliminating that line of work, this case does not deal with the destruction of the right to work, but only Congress' power to tax income from that work.   Here, therefore, the United States' taxation of the Hopkins' income, the earnings derived from engaging in their chosen occupation, is constitutional, as it has been since the time the people adopted the Constitution.

The Hopkins point out that the power to tax income appears inconsistent with the statement

of the Honorable John Marshall, Chief Justice of the Supreme Court of the United States, that "[a]n unlimited power to tax involves, necessarily, a power to destroy; because there is a limit beyond which no institution and no property can bear taxation." McCulloch v. Maryland, 17 U.S. at 327. They assert that, because not even the United States government has the power to destroy a fundamental right, the logical implication is that the United States does not, therefore, have the power to tax their exercising their right to labor.  The Court agrees that there is an apparent tension between the propositions in McCulloch v. Maryland that the state of Maryland could not tax a federal entity because it might be able to destroy the federal entity, and the ability of the federal government to tax a fundamental right, but that tension was resolved in favor of taxation -- not the right to work -- when the people adopted the Constitution with Article I, section 8 giving Congress the broad tax power.  The case does not require the judicial branch to decide whether Congress is destroying a profession, and as the Supreme Court recognized in Springer v. United States, the electorate would not likely sit back and allow Congress to impose an income tax so burdensome that no person could bear the level of taxation imposed.  See 102 U.S. at 594 ("If the laws here in question involved any wrong or unnecessary harshness, it was for Congress, or the people who make congresses, to see that the evil was corrected. The remedy does not lie with the judicial branch of the government.").  Further, if Congress imposed such a tax, however ill-advised it may be to do so, it is possible that the Due Process Clause may be invoked to support finding that the imposition of such a burdensome tax is unconstitutional as arbitrary, and unrelated to any legitimate state power.  See Meyer v. Nebraska, 262 U.S. at 399-400("[T]his liberty may not be interfered with, under the guise of protecting the public interest, by legislative action which is arbitrary or without reasonable relation to some purpose within the competency of the state to effect.").  The Hopkins do not argue, however, that the tax imposed upon them here, which they

are contending is unconstitutional, is such a burdensome and arbitrary tax, and if they did the argument would not be powerful.   Congress has not approached the point at which the taxation of income destroys the right to work and enjoy its fruits.

The Supreme Court cases exempting exercise of one's fundamental rights from licenses or taxes, when specifically noting that income derived from their exercise may be subject to taxation, also provide support for the United States' contention that the taxation of the Hopkins' labor is constitutional.   See Murdock v. Pennsylvania, 319 U.S. at 112 (1943)("It is one thing to impose a tax on the income or property of a preacher.   It is quite another thing to exact a tax from him for the privilege of delivering a sermon."); Follett v. Town of McCormick, S.C., 321 U.S. at 577-78 ("The exemption from a license tax of a preacher who preaches or a parishioner who listens does not mean that either is free from all financial burdens of government, including taxes on income or property.").   It might be possible to advance an argument that government, under Murdock v. Pennsylvania and Follett v. Town of McCormick, S.C., might be constitutionally precluded from enacting a tax on the exercise of the fundamental right to engage in the occupation of one's choosing, protected as a liberty interest under the Due Process Clause if the tax fell on a person merely for working even if the person were not deriving income from the work and acceding to wealth and that it may be unconstitutional to exact a tax from a worker merely for engaging in an occupation.   That is not the situation here, however.   Once the Hopkins derive income from exercising their fundamental right -- or, in other words, are paid for working -- the Constitution allows the United States to impose a tax on the income derived from engaging in that activity -- their earnings.   See Murdock v. Pennsylvania, 319 U.S. at 113 (noting that a state "may not exact a license tax for the privilege of carrying on interstate commerce, although it may tax . . . the income derived from, that commerce, so long as those taxes are not discriminatory").   See Follett

v. Town of McCormick, S.C., 321 U.S. at 577-78 ("The exemption from a license tax of a preacher who preaches or a parishioner who listens does not mean that either is free from all financial burdens of government, including taxes on income or property." (emphasis added)).

In conclusion, while the Due Process Clause of the Fifth and Fourteenth Amendments protects the right to engage in the occupation of one's choosing as a liberty interest, that protection is not absolute.   The people as the sovereign power, in adopting the Constitution and specifically providing for Congress to tax and spend with only two express limitations, enabled Congress early on to legitimately tax income from whatever source derived -- including income for labor from common trades and professions.   The Hopkins' earnings from exercising their fundamental right to engage in the occupation of their choosing, their right to labor, is thus not constitutionally exempt from Congress' taxing power and never has been.   Because the Hopkins' income is not constitutionally exempt from taxation, and because Congress may constitutionally tax income from whatever source derived, unless Congress has statutorily exempted the Hopkins' income through the IRC, their income is not otherwise exempt.

### C.     THE IRC DOES NOT EXEMPT FROM TAXATION THE HOPKINS' EARNINGS FROM THEIR LABOR.

 The Hopkins argue that the United States "has grossly misapplied tax laws to what is 'exempted income,'" and that "all or a portion of [their] income may be 'exempt income.'" Hopkins' MSJ Response ¶ 4, at 6, 7.   They state: "Defendants will show in their Case-in-Chief that 26 U.S.C. § 861 [], 26 C.F.R. 1-861-8 [], and, 26 C.F.R. 1-861-8T(d)(2)(ii), specifically, all support Defendant's argument that 'exempt income means income that is, in whole or in part, exempt, excluded, or eliminated for federal income tax purposes.'"   Hopkins' MSJ Response ¶ 4, at 6-7 (quoting 26 C.F.R. 1-861-8T(d)(2)(ii)).   Because these sections of the IRC to which the

-85-

Hopkins refer deal exclusively with whether a person's income is excluded from gross income because it was wholly or partially earned outside of the United States or derived from sources outside of the United States, the sections do not support finding the Hopkins' income exempt from gross income under the IRC.

Under the IRC, income, from whatever source derived, including income from labor specifically, is presumed to be subject to taxation.   See 26 U.S.C. § 61(a)(1)("Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) . . . Compensation for services . . . ."); C.I.R. v. Jacobson, 336 U.S. at 49 ("The income taxed is described in sweeping terms and should be broadly construed in accordance with an obvious purpose to tax income comprehensively. The exemptions, on the other hand, are specifically stated and should be construed with restraint in the light of the same policy."). Income is only exempt from § 61's comprehensive definition of income if Congress has specifically provided for its exclusion or exemption.   See 26 U.S.C. §§ 61(a)(2), and 101 - 139.

Section 861 of the IRC, which the Hopkins provide as support for their contention that their income is exempt from taxation, applies only to exclude otherwise taxable income where: (i) the compensated labor was performed within the United States by "a nonresident alien . . . present in the United States" for less than ninety days during the year; (ii) the taxpayer makes less than $3,000.00; and (iii) the income is under a contract with a nonresident alien or foreign company or a United States citizen or company but for a foreign office.   26 U.S.C. § 861(a)(3).   The Hopkins do not contend that they are nonresident aliens or that the income which the United States alleges that they owe to the IRS in this civil case was derived from sources outside of the United States.

The Hopkins' citations to the Treasury Regulations interpreting § 861 section are also unavailing to the Hopkins.   Section 1.861-8T(d)(2)(ii) provides:

-86-

> For purposes of this section, the term exempt income means any income that is, in whole or in part, exempt, excluded, or eliminated for federal income tax purposes. The term exempt asset means any asset the income from which is, in whole or in part, exempt, excluded, or eliminated for federal tax purposes.

26 C.F.R. § 1.861-8T(d)(2)(ii)(A)(emphasis added).  First, by its terms, this subsection applies only to "this section" -- i.e., 26 U.S.C. § 861 -- which, because the Hopkins are not non-resident aliens in the country for less than ninety days, does not apply to them.   Second, this subsection of the regulation means only that "any income that is, in whole or in part, exempt, excluded, or eliminated," because Congress has exempted, excluded, or eliminated it elsewhere within the IRC, is also exempted, excluded, or eliminated before determining whether the taxpayer otherwise has income that is or is not subject to taxation under 26 U.S.C. § 861.   Thus, even if the Hopkins were nonresident aliens in the country for less than ninety days, and § 861 therefore applied to them, 26 C.F.R. § 1.861-8T(d)(2)(ii)(A) would allow them to exempt, exclude, or eliminate from their income only income otherwise exempted, excluded, or eliminated under the IRC before determining their gross income derived from sources within the United States over that less than ninety-day period.   That hypothetical is not the situation here, however.   The reality is that Congress has not exempted the Hopkins' income from taxation under the IRC.   The Court thus concludes that the Hopkins' earnings are constitutionally statutorily subject to Congress' tax power, and to the IRS' enforcement of Congress' exercise of that power through the IRC.

## II.   ISSUE PRECLUSION APPLIES, AND THE HOPKINS CANNOT RELITIGATE THAT THEY OWE A SUBSTANTIAL AMOUNT, THAT THEY EVADED TAXES, AND THAT THEY USED NOMINEES TO EVADE TAXES, BECAUSE THOSE ISSUES WERE NECESSARY TO THEIR CRIMINAL CONVICTION FOR TAX EVASION.

Although the United States asserts correctly that issue preclusion applies to preclude the relitigation of some the case's issues, it does not entitle it to as much as it might believe.   Because

a jury of their peers found the Hopkins guilty of tax evasion, the Hopkins are precluded from

relitigating issues only that were necessary to the jury's guilty verdict in their criminal convictions.

The Tenth Circuit's test for issue preclusion under res judicata consists of four elements:

> (1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been fully adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party, or in privity with a party, to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

Adams v. Kinder-Morgan, Inc., 340 F.3d at 1093 (quoting United States v. Botefuhr, 309 F.3d at

1282).   The Tenth Circuit has stated that whether a defendant is estopped from relitigating an

issue after a criminal trial depends on "whether the question was 'distinctly put in issue and

directly determined' in the criminal prosecution."   Metros v. U.S. Dist. Court for the Dist. of

Colo., 441 F.2d at 316   (quoting Emich Motors Corp. v. General Motors Corp., 340 U.S. at 569).

Thus, "[i]n the case of a criminal conviction based on a jury verdict of guilty, issues which were

essential to the verdict must be regarded as having been determined by the judgment."   Metros v.

U.S. Dist. Court for the Dist. of Colo., 441 F.2d at 316 (quoting Emich Motors Corp. v. General

Motors Corp., 340 U.S. at 569)(internal quotations omitted).

A jury in federal court, where the United States was the plaintiff, having come to a verdict

of guilty as to the Hopkins' criminal tax evasion, effectively establishes issue preclusion's second

and third elements.   Additionally, the Hopkins' convictions have recently been affirmed on

appeal.   See United States' Notice of Tenth Circuit Judgment Affirming Hopkins' Convictions,

filed February 6, 2013 (Doc. 162); United States v. Mark E. Hopkins and Sharon J. Hopkins, No.

11-2114, Order and Judgment at 22, 30, 40, 41 (10th Cir. Feb. 5, 2013), filed February 6, 2013

(Doc. 162-1).   The Hopkins quarrel that the identity of the primary parties in this case and in

their criminal case are not identical.   They are mistaken.   See Considine v. United States, 683

F.2d 1285, 1286 (9th Cir. 1982)("A prior conviction will estop a party from contesting in a later civil suit any element necessarily established in the criminal trial.").   The United States was the plaintiff in their criminal trial, and it is the United States as plaintiff here also.   Moreover, the Hopkins testified at their criminal trial.   Thus, pursuant to the first and fourth elements, in a civil trial following a criminal conviction, the determination whether the Hopkins are precluded from relitigating any specific claims necessarily turns only on whether the specific "issues [] were essential to the verdict . . . ."   Metros v. U.S. Dist. Court for the Dist. of Colo., 441 F.2d at 316.

M. Hopkins appealed his sentence only, and S. Hopkins appealed her sentence and "[w]hether the district court committed reversible 'structural error' and violated Sharon Hopkins' Sixth Amendment right to counsel of choice by permitting the IRS, in a separate administrative matter, to seize funds in the court registry that included funds Sharon Hopkins sought to use to pay her counsel of choice."   S. Hopkins' Opening Brief ¶ 1, at 2.   The Hopkins' argument that a final judgment has not been reached is thus foreclosed and the Hopkins are precluded, by the doctrine of issue preclusion, from relitigating, or controverting, any issues that were necessary to the jury's verdict of guilty.   See Metros v. U.S. Dist. Court for the Dist. of Colo., 441 F.2d at 316 ("In the case of a criminal conviction based on a jury verdict of guilty, issues which were essential to the verdict must be regarded as having been determined by the judgment.")(quoting Emich Motors Corp. v. General Motors Corp., 340 U.S. at 569); Leo v. Garmin Intern., Inc., 464 F. App'x 737, 740 (10th Cir. 2012)("[I]t does not matter that [the plaintiff's] first appeal had not been resolved at the time [he] filed his second suit because under the federal law of claim preclusion, the district court's order was final for res judicata purposes.").   Moreover, the Tenth Circuit, on February 5, 2013, entered its Order and Judgment, affirming Judge Armijo's denial of Sharon Hopkins' motion to dismiss the indictment and affirming the Hopkins' sentences.   See United States'

Notice of Tenth Circuit Judgment Affirming Hopkins' Convictions at1; United States v. Hopkins, No. 11-2114 at 22, 30, 40, 41.   The Hopkins' criminal conviction of tax evasion is thus now final and, under issue preclusion, the Hopkins are precluded from relitigating any issues that were necessary to the jury's verdict in that case.

### A.   THE HOPKINS ARE PRECLUDED FROM RELITIGATING WHETHER THEY OWE A SUBSTANTIAL AMOUNT OF TAX.

The facts do not support the Hopkins' argument that the cause of action in this civil suit is dissimilar to that of the United States' criminal case against them.   Necessary to the jury's determination that the Hopkins criminally evaded taxes was that the [Hopkins] owed substantial income tax . . . ."   Court's Jury Instructions in No. 09-0863 MCA, Jury Instruction No. 7, at 19. Because the jury returned a verdict of guilty against the Hopkins for the crime of tax evasion, the Hopkins are precluded from arguing other than that they do, in fact, owe to the United States a substantial amount of income tax.   The Hopkins are thus precluded from contending otherwise in this civil case.

### B.   THE HOPKINS ARE PRECLUDED FROM RELITIGATING WHETHER THEY USED NOMINEES TO CONCEAL THEIR INCOME, BANK ACCOUNTS, AND OWNERSHIP OF ASSETS FROM THE IRS.

It was also necessary to the jury's guilty verdict to find that the Hopkins used nominees to conceal their income, bank accounts, and ownership of assets, but it was not necessary that the jury identify any particular entities as the nominees.   Whether a particular fact is necessary to the jury's verdict depends on the circumstances of the crime with which the defendant is charged and found guilty, the amount of evidence in the record, or lack thereof, linking the guilty verdict to the charge.   In United States v. Three Tracts of Property Located on Beaver Creek, Knott Cnty., Ky., 994 F.2d 287 (6th Cir. 1993)("United States v. Three Tracts of Property"), the United States Court

of Appeals for the Sixth Circuit held that the criminal conviction of three claimants for manufacture of marijuana necessarily established that they had used their 51-acre parcel of land to grow marijuana, but the conviction did not necessarily answer the question whether the $29,100.00 found in the claimants' mobile home were proceeds from drug sales.   See 994 F.2d at 290-91.   Where the claimants were convicted "of conspiracy to manufacture with intent to distribute marijuana," and "knowingly and intentionally manufacturing and aiding and abetting the manufacture of marijuana," the Sixth Circuit concluded that the verdict necessarily established that the claimants' property was used to facilitate the marijuana manufacturing with each of the claimants' knowledge and consent.   See United States v. Three Tracts of Property, 994 F.2d at 290.   In regard to $29,100.00 that officers found in the trunk of a car that one of the convicted claimants owned, the Sixth Circuit held that "a finding that the [] currency represented proceeds from illegal drug sales was not 'necessary and essential to the judgment' on the merits," because the claimant "was charged and convicted of manufacturing, not selling, marijuana."   United States v. Three Tracts of Property, 994 F.2d at 291.   The Sixth Circuit additionally found that there was a genuine issue whether the currency was drug proceeds, as the claimant "testified at trial that [the] cash was derived from a settlement of his black lung claim as a coal miner."   994 F.2d at 291.   In United States v. One Parcel Property Located at 200 Penn. Ave., Claymont, Del., With all Appurtenances & Improvements Thereon, 786 F. Supp. 400 (D. Del. 1992)("United States v. 200 Pa. Ave."), the Honorable James L. Latchum, United States District Court Senior Judge for the District of Delaware, concluded that the doctrine of issue preclusion did not establish that the United States was entitled to summary judgment as to whether there was a substantial connection between the defendant residence and the unlawful distribution of cocaine, to which the claimant had pled guilty in state court.   786 F. Supp. at 405.   Judge Latchum stated:

The state court did not render a final judgment on the issue of where the distribution of cocaine took place, the conviction does not tie the illegal activity to the defendant residence, and the record does not reflect that drugs, drug paraphernalia, tainted money, or loaded weapons were found on the defendant premises. This Court finds that the location of the drug sale was not a critical and necessary part of the judgment and that the issue was not necessarily decided by the state court.

United States v. 200 Pa. Ave., 786 F. Supp. at 405 n.7.   In United States v. Premises Known as RR No. 1 Box 224 Dalton, Scott Tp. And North Abington Tp., Lackawanna Cnty., Pa., 14 F.3d 864 (3d Cir. 1994)("United States v. RR No. 1 Box 224"), where the United States brought a criminal forfeiture action against the defendant for distribution of cocaine and the jury found the defendant guilty but failed to find beyond a reasonable doubt that the defendant's residence was connected to the distributions, the United States Court of Appeals for the Third Circuit held that the United States was not entitled to issue preclusion as to whether the house was connected to the drug distribution in the subsequent in rem civil case.   See 14 F.3d at 871-72.

The jury found beyond a reasonable doubt that the Hopkins committed the overt act of using nominees to shield their income from the IRS, and the Jury Instructions evince that the nominees discussed at trial included House of Royale, the Grace Trust, and Shalom Enterprises. Although Counts 2 through 8 of the indictment did not specifically include by reference the "Manner and Means" paragraphs of the indictment, the "Manner and Means" paragraphs are the only paragraphs of the Indictment, included in the Jury Instructions, that use the word "nominee" in conjunction with a person or entity.   Whereas there was no evidence connecting the charge for which the claimant was convicted with the residence the United States sought to seize in United States v. 200 Pa. Ave., the Jury Instructions use the word nominee in connection with the Grace Trust, Shalom Enterprises, House of Royale, and the allegations of the Hopkins' tax evasion scheme multiple times.   This language in the instructions evinces that here there was evidence at

-92-

trial from which a connection between the Hopkins' criminal tax evasion and House of Royale, the Grace Trust, and Shalom Enterprises could have been established.   Additionally, although the jury instructions do specify the particular entities which the Hopkins used as nominees in the second element required to find tax evasion, the case is distinguishable from United States v. RR No. 1 Box 224, where the jury specifically found that the government had not proved beyond a reasonable doubt that the property was connected to the claimant/defendant's drug distribution. Here, on the other hand, the jury found that the Hopkins used entities as nominees, but the jury instructions did not require the jury to explicitly state the entities which it reasoned that the Hopkins' used as such.   Moreover, whereas in United States v. Three Tracts of Property the Sixth Circuit held that the claimant's conviction for manufacturing marijuana -- as opposed to distributing marijuana -- was insufficient to preclude him from litigating whether the currency was proceeds from drug sales, the Hopkins were convicted of tax evasion by the overt act of using nominees to criminally conceal their income, bank accounts, and ownership of assets from the IRS.   See Jury Instructions at 19.   Thus, there is a direct connection between using nominees to evade taxes -- the crime for which the jury found the Hopkins guilty -- and evidence at trial that the Grace Trust, House of Royale, and Shalom Enterprises were the nominees that the Hopkins used.

That the jury found the Hopkins guilty of tax evasion using nominees, but not specifically naming the nominees, is similar to United States v. Three Tracts of Property.   The Sixth Circuit held that the claimants' conviction for manufacturing marijuana and the officers having found plants growing on the fifty-one acres of land was sufficient to find that the fifty-one acres of land being used in the conviction was precluded from relitigation under issue preclusion; in this case, the jury's guilty verdict included the determination that the Hopkins criminally evaded taxes using nominees to shield income.   In United States v. Three Tracts of Property, however, where the

claimants were convicted of manufacturing marijuana and the officers had found marijuana growing on the entirety of their fifty-one acre property, there was no alternative to the conclusion than that the marijuana growing on their property was necessary to the verdict.   In this case, on the other hand, the Indictment, as restated in the Jury Instructions, lists six other entities the Hopkins "used to conceal their assets."   Jury Instructions ¶ 5, at 4.   The United States fails to refer the Court to any evidence presented at the Hopkins' criminal trial on which the jury necessarily concluded that it was specifically the Grace Trust, the House of Royale, and Shalom Enterprises -- the entities that the United States seeks here to have the Court conclude the Hopkins used as nominees -- that were the nominees for which the jury convicted the Hopkins of tax evasion.   See Metros v. U.S. Dist. Court for the Dist. of Colo., 441 F.2d at 316 ("In the case of a criminal conviction based on a jury verdict of guilty, issues which were essential to the verdict must be regarded as having been determined by the judgment.")   It might be logical to conclude that, because the House of Royale and Shalom Enterprises are the only corporations -- as opposed to trusts or other entities -- listed in the Jury Instructions, they were necessarily the nominees on which the jury's verdict relies.   Without specific evidence in the record that the jury made such a finding during the criminal trial, however, the Court cannot soundly conclude that the question whether these particular entities were the nominees on which the jury convicted the Hopkins of tax evasion "was 'distinctly put in issue and directly determined' in the criminal prosecution." Metros v. U.S. Dist. Court for the Dist. of Colo., 441 F.2d at 316.   The Court thus cannot conclude that these two elements -- (i) that the issue previously decided is identical with the one presented here; and (ii) that the Hopkins had a full and fair opportunity to litigate the issue in the prior action -- are met for purposes of issue preclusion.   Issue preclusion, therefore, precludes the Hopkins from denying that they used nominees, but does not preclude the Hopkins from litigating the issue

in this civil trial whether the Grace Trust, Shalom Enterprises, and/or House of Royale were the Hopkins' nominees and/or alter-egos.

## III.     THE HOPKINS USED THE GRACE TRUST, SHALOM ENTERPRISES, AND HOUSE OF ROYALE AS THEIR NOMINEES/ALTER-EGOS.

Although the United States is not entitled to the Court finding that the Hopkins are precluded from relitigating whether the Grace Trust, Shalom Enterprises, and House of Royale were the Hopkins' nominees/alter-egos to conceal their income, bank accounts, and ownership of assets, and whether the amounts reflected in the IRS assessments is valid and correct, the Hopkins do not dispute these as facts.   The Hopkins do not dispute that they used Grace Trust, Shalom Enterprises, and House of Royale to hold title to their properties.   See Hopkins' MSJ Response ¶ 1, at 2-4 (discussing the "genuine factual disputes," but never mentioning there is a genuine factual dispute regarding the nominees, or Grace Trust, Shalom Enterprises, and House of Royale specifically). The Hopkins also do not take issue with the amounts reflected on the Hopkins' Forms 4340, but rather contend that their income, as a whole, is "exempt" from the United States' taxing power.   See, e.g., Hopkins' MSJ Response ¶ F, at 4 ("Plaintiff alleges that Defendants owe the amounts due in the tables[] totaling $856,481.00.   Defendants dispute this amount as such is 'exempt' income as per 26 U.S.C. § 61 as lodged in 'except as otherwise provided in this subtitle.'"); Tr. at 44:9-20 (M. Hopkins)(answering that the Court is correct that they do not dispute the facts of the legal assessment; rather, their "dispute [is] about the validity of the assessment from a legal standpoint")(emphasis added).   Moreover, the Court in this civil case previously entered judgment against both Shalom Enterprises and House of Royale, ordering and decreeing that the entities are "nominee[s]/alter ego[s] of Mark Hopkins and Sharon Hopkins . . . merely holding title to [] property for the real owners Mark Hopkins and Sharon Hopkins."

Default Judgment Against Defendants House of Royale, Inc. and Shalom Enterprises, Inc. at 1-2. The Hopkins did not oppose the United States' Unopposed Motion for Entry of Agreed Judgment as to Advanced Electronics and Tract #4, filed October 11, 2012 (Doc. 114), and have not disputed the Court's filing. Under the law-of-the-case doctrine, the Hopkins are precluded from contesting that decision now. See Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 815-16 (1988) ("[T]he doctrine [of the law of the case] posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.")(quoting Arizona v. California, 460 U.S. 605, 618 (1983)).   Regarding the Grace Trust, the Tenth Circuit, in affirming the Hopkins' sentences in the criminal appeal, noted that "trusts were used by Sharon Hopkins to evade taxes.   By her affirmatively engaging minors to sign the trusts as beneficiaries, she 'used' the minors' involvement to provide an appearance of legitimacy to the trusts, and thereby hide the true purpose of the trusts." United States v. Hopkins, No. 11-2114, at *27 n.11.   The Court therefore concludes that the Grace Trust, Shalom Enterprises, and House of Royale specifically are the nominees which the jury concluded the Hopkins used "to conceal their income, bank accounts, and ownership of assets."   Jury Instructions at 19.

## IV.  THE IRS ASSESSMENTS AND LIENS ARE VALID, AND THE UNITED STATES IS ENTITLED TO FORECLOSURE.

In this civil case, the IRS has competent summary judgment evidence of its valid tax assessments against the Hopkins: the Hopkins' Forms 4340.   An assessment is a bookkeeping entry "recording the liability of the taxpayer."   26 U.S.C. § 6203.   An assessment is made when a taxpayer "[s]elf-assesses," i.e., files a personal income tax return, or, when the IRS prepares a substitute for return ("SRF"), under 26 U.S.C. § 6020(b).   The assessment is important to creation of a federal tax lien.   See 26 U.S.C. § 6321, 6322.   "For purposes of granting summary judgment,

a Certificate of Assessment and Payments is sufficient evidence that an assessment was made in the manner prescribed by § 6203 and Treas. Reg. 301.6203-1." Long v. United States, 972 F.2d at 1181 (10th Cir. 1993)(citing James v. United States, 970 F.2d at 755; Hughes v. United States, 953 F.2d at 539-40). See United States v. Silkman, 220 F.3d 935, 937 (8th Cir. 2000); United States v. Voorhies, 658 F.2d 710, 715 (9th Cir, 1981)("[T]he certificates of assessment were prima facie correct and therefore adequate evidence of the amount of [the taxpayer's] tax liability."). Cf. McCarty v. United States, 929 F.2d 1085, 1089 (5th Cir. 1991)(holding that Form 4340 showing "notice of assessment and demand for payment" is admissible under the Federal Rules of Evidence). The Hopkins' Forms 4340 are prima facie evidence of tax liability. These tax assessments evidence M. Hopkins' and S. Hopkins' tax liability to the United States for tax years 1996, 1997, 1999, 2000, and 2001. These certificates show, not only that the Hopkins had a substantial amount of tax due and owing to the United States for each of the years, but reflect the amount owing as of October 19, 2010. These records, see Hopkins Crim. Gov. Ex. 190-195; IRS audit papers for tax years 1996, 1997, 1999, 2000, and 2001(corroborating the information found in the Forms 4340s), show that the Hopkins did not file valid returns in the tax years at issue, so the IRS prepared a substitute for return, which resulted in an assessment. In light of the undisputed facts relating to the assessments and accruals of tax liabilities of the Hopkins found in the Hopkins' Form 4340s, the Court concludes that the tax assessments are valid and establish that the Hopkins owe the United States the amount that the IRS assessed on these Hopkins' Form 4340s.

## V. THE IRS' LIENS AGAINST THE HOPKINS THAT AROSE AT ASSESSMENT AND ATTACHED TO THE HOPKINS' INTERESTS ARE EQUALLY VALID AND EFFECTIVE AGAINST THE NOMINEES.

The United States is entitled to foreclose on its liens that arose when the IRS made its tax assessments, the Hopkins' Forms 4340, and is entitled to foreclose on the liens against the

nominees: the Grace Trust, Shalom Enterprises, and House of Royale.   "Unless another date is specifically fixed by law, the lien imposed by section 6321 shall arise at the time the assessment is made and shall continue until the liability for the amount so assessed . . . is satisfied or becomes unenforceable by reason of lapse of time."   26 U.S.C. § 6322.   A tax lien arising under 26 U.S.C. § 6321 is a valid exercise of Congress' Constitutional tax and spending power.   See Michigan v. United States, 317 U.S. at 340 ("The establishment of a tax lien by Congress is an exercise of its constitutional power 'To lay and collect Taxes'")(citing U.S. Const. art. I, § 8).   The IRS tax lien is effective against all property and rights to property, whether real or personal, including after-acquired property belonging to the taxpayer.   "The lien arises on the date that the IRS assesses unpaid taxes, applies to currently owned as well as after-acquired property, and continues until the taxpayer satisfies the debt, or the statute of limitations runs."   Texas Commerce Bank-Fort Worth, N.A. v. United States, 896 F.2d at 161.   See United States v. Hopkins, No. 11-2114, at *12 n.4 ("The lien attaches to all the taxpayer's property and rights to property at the time it is created as well as to after-acquired property.")(citing Glass City Bank v. United States, 326 U.S. 265, 268 (1945)).   The federal tax lien remains valid and enforceable until the debt is fully satisfied or becomes unenforceable by reason of lapse of time.   See 26 U.S.C. § 6322.   The IRS tax lien is fully perfected and enforceable against the taxpayer upon assessment; to prevail against the taxpayer, there is no need for the IRS to file a notice of lien in the public records.   See W. Nat'l Bank v. United States, 812 F. Supp. at 705; In re Kohout, 236 B.R. at 369.   The statutory lien under 26 U.S.C. § 6321 is silent and is always given priority unless one of the exceptions in 26 U.S.C. § 6323 applies.   See W. Nat'l Bank v. United States, 812 F. Supp. at 705.

A federal tax lien arose in favor of the United States against the Hopkins pursuant to 26 U.S.C. § 6321 on the date that the IRS first assessed the Hopkins for the tax owing for each of the

-98-

tax years -- December 25, 2000.  See 26 U.S.C. § 6321; Hopkins' Forms 4340; Hopkins Crim. Ex. 315.  The Hopkins' subsequently purchased the properties upon which the United States is seeking to foreclose its lien after the federal tax lien arose.  The Hopkins made the following purchases of the properties: Tract #1 - 601 N. Canyon in November 2001; Tract #2 - 605 N. Canyon in October 2002; Tract #3 - 607 N. Canyon in April 2002; and Tract #4 N. Canyon, 110, and 118 W. Bonbright, in November 2003.  Thus, at a time when they owed income taxes and federal tax liens existed, the Hopkins acquired properties in the names of nominee entities -- the Grace Trust, Shalom Enterprises, and House of Royale -- to avoid IRS collection.  As part of their tax conspiracy and evasion, M. Hopkins and S. Hopkins used Shalom Enterprises and House of Royale to acquire their home and adjoining real properties -- the four real estate tracts at issue here -- as a way of keeping their assets and ownership interests hidden from the IRS.  The IRS tax lien against the Hopkins is effective against all property and rights to property, whether real or personal, including after-acquired property belonging to the taxpayer.  See Texas Commerce Bank-Fort Worth, N.A. v. United States, 896 F.2d at 161 ("The lien arises on the date that the IRS assesses unpaid taxes, applies to currently owned as well as after-acquired property, and continues until the taxpayer satisfies the debt, or the statute of limitations runs."). The use of a nominee to hold property does not affect the reality that all of the rights to the property held in the names of the nominees -- Shalom Enterprises and House of Royale -- belong to the Hopkins.  Moreover, the Hopkins have agreed that, if the Court does not agree with their argument that the income from exercising their right to labor is exempt from taxation, then the IRS' facts are correct.  See Tr. at 39:4-6 (M. Hopkins)(conceding that, "if we are not exempt everything [the United States] has said is correct.").  Accordingly, there being no material dispute as to any of these facts, the IRS is

entitled to foreclose its federal tax liens on these properties,[10] and the United States is thus entitled to summary judgment as a matter of law.

**IT IS ORDERED** that: (i) the Defendants' Motion for Leave of Court to Reply to Plaintiffs' Reply to Hopkins' Response to Motion for Summary Judgment, filed September 4, 2012 (Doc. 106), is granted; (ii) the Defendants' Motion for Telephonic Appearance Re: Motion Hearing on January 3, 2013, filed December 21, 2012 (Doc.141), is granted; and (iii) the United States' Motion for Summary Judgment, filed July 16, 2012 (Doc. 66), is granted in part and denied in part.   The Court therefore:

1.      Grants summary judgment in favor of Plaintiff United States of America against Defendant Mark Hopkins, such that M. Hopkins is indebted to the United States for $732,811.61, as of October 19, 2010, for the federal income taxes assessed against him for the tax years 1996, 1997, 1999, 2000 and 2001, plus interest and all statutory additions provided by law until paid;

2.      Grants summary judgment in the United States' favor against Defendant Sharon Hopkins, such that S. Hopkins is indebted to the United States for $123,670.98, as of October 19, 2010, for the federal income taxes assessed against her for the tax years 1996 and 1997, plus interest and all statutory additions provided by law until paid;

---

[10] The Court need not decide whether the IRS' tax liens on the properties have priority over those of Bayview Loan with regard to 601 N. Canyon.   Bayview Loan seeks to protect its interest based on a promissory note that House of Royale made, signed in November, 2007, by S. Hopkins as director, which secured and properly perfected on the real property located at 601 N. Canyon, on which House of Royale has defaulted, and thus opposes the United States' Motion for Summary Judgment to the extent that it seeks to have its lien declared prior and superior to Bayview Loan's lien on 601 N. Canyon.   Bayview Loan, in its response to the United States' summary judgment motion, however, states that, in an effort to resolve their differences without adding to the expense of this litigation, it has agreed with the United States "that Plaintiff and Bayview are both entitled to foreclose on their liens against [] 601 N. Canyon, and have agreed upon an equitable division of the proceeds of the sale of the property."   Bayview's MSJ Response ¶ 3, at 2.   The Court accepts the parties' stipulation, will thus deny, in part, the United States' Motion for Summary Judgment, and will enter summary judgment accordingly.

3.    Orders that the terminated Defendants House of Royale, Inc., Shalom Enterprises, Inc., and The Grace Trust, are nominees, alter egos, transferees, agents, and/or holders of the Hopkins' beneficial interest in Tracts 1, 2 and 3;

4.    Orders that the United States has valid liens on Tracts 1, 2 and 3;

5.    Orders the foreclosure of such IRS tax liens, and orders that such Tracts 1, 2 and 3 be sold in accordance with the law and the Court's practices.  That the sale's proceeds be distributed in accordance with the Court's findings, the United States' rights, and the United States' stipulation with Defendant Bayview Loan Servicing, LLC, that there will be an equitable division of the proceeds of the property; and

6.    Orders that Advanced Electronics, not Shalom Enterprises, nor the Hopkins, who failed to pay the amounts required under the contract, and have no rights or interests in the property, owns Tract 4 located at 602 N. Canyon, Carlsbad, N.M. and 108 & 110 W. Bonbright, Carlsbad, Eddy County, New Mexico.[11]

_____
UNITED STATES DISTRICT JUDGE

*Counsel and Parties*:

Kenneth J. Gonzales
     United States Attorney
Albuquerque, New Mexico

_____

[11] This order is consistent with the Court's previous Order Granting United States' Unopposed Motion for Entry of Agreed Judgment as to Advanced Electronics and Tract #4, filed November 16, 2012 (Doc. 129)("Tract #4 Order").   In that order, pursuant to the stipulation and agreement of the parties, including the Hopkins, the Court entered judgment, decreeing that "Shalom Enterprises, Inc. and Mark and Sharon Hopkins shall have no right, title and interest in, Tract #4.   Advanced Electronics is sole owner of, and shall hold all legal right, title and interest in, Tract #4."   Tract #4 Order ¶ 5, at 2.

-- and --

Manuel P. Lena Jr.
Herbert W. Linder
Tax Division
United States Department of Justice
Dallas, Texas

       *Attorneys for the Plaintiff*

Mark E. Hopkins
Federal Correctional Institution
    La Tuna
Anthony, Texas

       *Defendant pro se*

Sharon J. Hopkins
Federal Correctional Institution
    Phoenix
Phoenix, Arizona

       *Defendant pro se*

Michael B. Neill
Attorney at Law
Austin, Texas

-- and --

Peggy Whitmore
LeNatria Holly Jurist
Castle Stawiarski, LLC
Albuquerque, New Mexico

--   and --

Arturo L. Jaramillo
Cuddy & McCarthy LLP
Santa Fe, New Mexico

-- and --

Elizabeth Mason
Albuquerque, New Mexico

-102-

*Attorneys for Defendant Bayview Loan Servicing, LLC*

Beth L. Hightower
Sanders, Bruin, Coll & Worley, P.A.
Roswell, New Mexico

*Attorneys for Defendant Advanced Electronics*

Lewis J. Terr
    Special Assistant Attorney General
New Mexico Attorney General's Office
Santa Fe, New Mexico

*Attorneys for Defendant New Mexico Taxation and
    Revenue Department*

-103-